REVISED JULY 20, 2001
IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-40813
_____


JOHNNY JOE MARTINEZ


                              Petitioner - Appellant

     v.

GARY L JOHNSON, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, INSTITUTIONAL DIVISION


                              Respondent - Appellee

_____

          Appeal from the United States District Court
               for the Southern District of Texas
_____
                       June 22, 2001
Before KING, Chief Judge, and JONES and STEWART, Circuit Judges.

KING, Chief Judge:

     Petitioner-Appellant Johnny Joe Martinez, a Texas death-row

inmate, appeals the district court's denial of his 28 U.S.C.

§ 2254 petition challenging his conviction and death sentence.

For the following reasons, we AFFIRM.



                      **I. FACTUAL BACKGROUND**

On July 15, 1993, nineteen-year-old Johnny Joe Martinez robbed a convenience store in Corpus Christi, Texas and murdered Clay Peterson, a college student working alone at the store. According to the facts developed at trial, at approximately 3:00 a.m., Martinez drove to the 7-Eleven convenience store with Ernest Wortmann,[1] an individual Martinez had met earlier that evening at a nightclub. Martinez testified to having consumed twelve to thirteen alcoholic drinks during an evening spent frequenting nightclubs. Martinez and Wortmann had left the last nightclub near closing time, planning to meet friends at a local park. As they were driving, Wortmann's car began overheating.

Because of this car trouble, they pulled into the 7-Eleven parking lot. Martinez entered the convenience store and asked Peterson where the restroom was located. After using the restroom, Martinez proceeded to shoplift several items from the store. Martinez exited the store and rejoined Wortmann. Martinez testified that as they waited for the car to cool down, Wortmann told Martinez that he used drugs, needed money, and was recently out of jail for robbing convenience stores. Martinez testified that he jokingly suggested to Wortmann that Wortmann

---

[1]  There is some discrepancy on the proper given name of Mr. Wortmann. The State refers to him as "Paul Wortmann." In the direct appeal of this case, the Texas Court of Criminal Appeals refers to him as "Ernest Wortmann." We adopt the latter designation.

should rob the 7-Eleven.  Martinez testified that the two men then discussed how easy it would be to rob the store.

At approximately 3:20 a.m., Martinez re-entered the store. The security camera videotape shows Martinez asking Peterson for something from the store.  As Peterson turned to retrieve the item, Martinez grabbed him from behind and put a small pocket knife to his throat.  Martinez then forced Peterson around to the cash register.  Peterson opened the cash register and allowed Martinez to remove the money.  Martinez then stabbed Peterson in the neck once or twice, and Peterson fell face first on the floor.  When Peterson tried to get up, Martinez stabbed him several more times in the back.  The evidence demonstrated that Peterson was stabbed eight times.  In addition, the medical examiner testified that Peterson suffered several scratches on his neck and defensive wounds to his hands.

After committing the crime, Martinez walked to a nearby beach.  He testified that he fell to his knees and cried. Fifteen minutes after the murder, Martinez called 911 from a nearby motel, told the police dispatcher that he had stabbed the clerk at the convenience store, and announced that he would wait until police arrived.  He asked the dispatcher what had happened to the man he had stabbed.  Motel security testified that Martinez appeared tired and slightly intoxicated.  The arresting officer testified, however, that Martinez did not appear to be under the influence of alcohol.  Upon the officers' arrival,

3

Martinez surrendered without resistence.  He cooperated with the officers as they tried to find the murder weapon, which had been thrown away after the murder.  The arresting officer described Martinez as cooperative and concerned about what had happened.  In the police car, Martinez vomited.  On the way to the station, Martinez asked whether he had killed the store clerk.

At the police station, Martinez confessed to killing Clay Peterson.  The officer who interviewed Martinez described his demeanor as "upset" and "remorseful."  The officer noted that Martinez did smell of alcohol, but he did not believe that Martinez was intoxicated.  Martinez tried to explain his actions, fabricating stories and describing the murder in a manner that would later prove untrue.[2]

---

[2]  For example, Martinez claimed that the 7-Eleven convenience store where the crime occurred was the fourth that he and Wortmann had gone to that night.  The evidence shows, however, that only one 7-Eleven store exists in the area. Martinez also claimed that when he put the knife to Peterson's neck, Peterson "started fighting with me, and he was a lot bigger than I am, and I stabbed him in the neck.  I dropped the knife and he tried to grab me.  I grabbed the knife again, and stabbed him, again, in the back."  This description of the murder is refuted by the videotape.  In addition, Martinez claimed that he had traveled to Corpus Christi that day by bus, a fact he later admitted was untrue and an attempt to protect the friends with whom he had been out that evening.  Finally, Martinez provided several conflicting stories about whether he chose to get into Wortmann's car after the murder or whether Wortmann actually drove away, abandoning Martinez at the scene of the crime.

At trial, Martinez admitted that he "lied on the [police] statement because I was trying to make something justified [sic] what I did."

4

Martinez testified at the guilt-innocence phase of trial. He admitted that there was no justification for what he did. He insisted that he only intended to scare the clerk with the knife and that he could not remember all of his actions, including the stabbing. When asked on cross-examination why he stabbed the deceased, Martinez testified "I don't know. That's a question I will never be able to answer." He expressed bewilderment and remorse for his violent act. Based on the overwhelming evidence, including his confession and the security camera videotape, Martinez was found guilty of capital murder on January 26, 1994.

At the punishment phase of trial, the State presented no evidence, resting on the facts introduced at the guilt-innocence phase. The defense called several witnesses to demonstrate that Martinez had a non-violent disposition. The defense introduced testimony from Donna DeLeon, who supervised Martinez when he worked with mentally retarded children at a local hospital. DeLeon testified that Martinez was good with the residents and did not have a violent character. Verna D. Rodriguez, a friend who had known Martinez for most of his life, testified that she had never seen him behave violently and that she was surprised that he had committed the offense. Rodriguez also provided information that, despite having grown up in a violent neighborhood marked by poverty and abuse, Martinez had never acted violently. David Martinez, the petitioner's oldest brother, testified that their natural father had not stayed with

5

the family and that their stepfather, Jesus Chavera, had been murdered. David Martinez testified that he had never known the petitioner to be involved with any criminal activity and that he had never known the petitioner to be violent except for a single school fight in junior high school. David Martinez testified that he trusted petitioner to care for his children and that there was nothing in the petitioner's past that would have indicated the possibility of a violent act. Frances B. Martinez, the woman who helped raise the petitioner, testified that he was "a good son," that she was surprised that he had been arrested, and that there was nothing in his past that would have indicated the possibility of a violent act. Finally, Esequiel Rodriguez, the Classification Coordinator and Counselor for the Nueces County Jail, testified that Martinez had adapted well to prison life and displayed no serious behavior problems.

The State presented no rebuttal case. After consideration of the special issues in Subsections 2(b) and 2(e) of Article 37.071 set forth in the Texas Code of Criminal Procedure,[3] the

---

[3] See TEX. CODE CRIM. PROC. ANN. art. 37.071 (Vernon 2001). Subsections 2(b) and 2(e) read in relevant part:

> (2) (b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:
>     (1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; . . . .
> . . . .
> (e)(1) The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b) of this article, it shall answer the

jury answered the future dangerousness special issue (Subsection 2(b)) in the affirmative, and the mitigation special issue (Subsection 2(e)) in the negative. As a result of these answers, the trial judge automatically sentenced Martinez to death. See TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(g) ("If the jury returns an affirmative finding on each issue submitted under Subsection (b) of this article and a negative finding on an issue submitted under Subsection (e) of this article, the court shall sentence the defendant to death.").

## II. PROCEDURAL BACKGROUND

### A. State Court Proceedings

On direct appeal to the Texas Court of Criminal Appeals ("CCA"), Martinez was again represented by trial counsel. Martinez raised six claims, including a primary challenge to the sufficiency of the evidence to support the jury's answer of "yes" to the future dangerousness special issue. On May 22, 1996, the CCA affirmed the conviction and death sentence. See Martinez v.

---

following issue:
> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

TEX. CODE CRIM. PROC. ANN. art. 37.071, § (2)(b), (e).

7

State, 924 S.W.2d 693 (Tex. Crim. App. 1996).[4]  The CCA methodically analyzed the relevant precedent regarding future dangerousness and determined that "a rational jury could have determined beyond a reasonable doubt that appellant would be a continuing threat to society."  Id. at 698.  Four judges dissented from the affirmance of the death penalty, arguing that the CCA had found such evidence insufficient to support a finding of future dangerousness in cases in which the facts were more aggravated than the facts of the instant offense.  See id. at 699 (Baird, J., dissenting in part); id. at 706 (Maloney, J., dissenting in part).

On March 13, 1997, pursuant to Article 11.071 of the Texas Code of Criminal Procedure, the CCA appointed Nathaniel Rhodes to represent Martinez in his state habeas corpus proceeding.  Rhodes had not previously handled a state habeas corpus petition.  Rhodes first filed a skeletal preliminary Application for a Writ of Habeas Corpus.  This application contained boilerplate claims of generic constitutional error and was submitted in an effort to toll statutes of limitation that might arise as a result of a change in federal habeas corpus law.

On September 8, 1997, Rhodes filed Martinez's Amended Original Application for Habeas Corpus.  The Amended Application was only five and one-half pages long and raised four claims.

---

[4]  The CCA's decision will be discussed in more detail in Part V infra.

8

Two claims were repetitive of arguments previously rejected on direct appeal.[5] The remaining two claims asserted record-based jury selection errors, but did not explain why these claims could not have been raised on direct appeal. In addition, pursuant to Article 11.071, § 8(b), Rhodes submitted proposed findings of fact and conclusions of law. These findings were two pages long, lacked citations to the record, and contained no case authority. The State submitted proposed findings of fact and conclusions of law with citations and legal authority; these findings were adopted by the trial court.

On April 29, 1998, pursuant to Article 11.071, § 9(f), the CCA denied relief. One judge dissented, stating:

> Applicant is represented by counsel appointed by this Court. The instant application is five and one half pages long and raises four challenges to the conviction. The trial record is never quoted. Only three cases are cited in the entire application, and no cases are cited for the remaining two claims for relief. Those claims comprise only 17 lines with three inches of margin. Under these circumstances, the merits of the application should not be reached. Instead, this matter should be remanded to the habeas court to determine whether applicant has received effective assistance of counsel.

Ex parte Martinez, No. Civ.A. 36840-01, 1998 WL 211569, at *1 (Tex. Crim. App. Apr. 29, 1998) (Baird, J., dissenting).

---

[5] The first claim repeated the insufficiency of the evidence to find future dangerousness argument raised and decided on the direct appeal. The second claim repeated the argument that Martinez's death sentence was unconstitutional because the jury was not informed that if it were to sentence him to life imprisonment, Martinez would be required to serve a minimum of thirty-five years. Rhodes acknowledged that this issue had been rejected by the Supreme Court and the CCA.

9

Further, the dissent noted in a footnote, "Our records reveal that counsel did not seek reimbursement for any travel or investigatory expenses, nor request any expert assistance in preparing the application. The same records reflect that counsel spent less than 50 hours preparing the application." Id. at *1 n.2.

Despite the fact that motions for reconsideration or rehearing of habeas decisions of the CCA are not permitted pursuant to Texas appellate procedure, see TEX. R. APP. P. 79.2(d), Rhodes filed a Motion for Reconsideration in the CCA, which reads in part:

> Petitioner [sic] attorney, Nathaniel G. Rhodes, has handled many direct appeals but has never handled a post-conviction writ of a death penalty case and therefore must humbly agree with the dissenting opinion in this case (without joining in its reasoning) that merits of this application should not be reached. Also Petitioners [sic] attorney requests that he be allowed to withdraw from the case and another lawyer be appointed to represent Petitioner in this cause.

Martinez did not know of the CCA's denial of his state habeas petition until he obtained a copy of Rhodes's Motion for Reconsideration.[6]

---

[6] In response to receiving the Motion to Reconsider, Martinez wrote the CCA to request another lawyer. On May 8, 1998, Martinez wrote the clerk of the CCA, informing the court of the ineffectiveness of his state-appointed counsel:

> I'm writing you this letter concerning my State Habeas Corpus proceedings. My lawyer Nathaniel G. Rhodes filed my State Habeas Corpus Writ obviously and intentionally knowing that he had no clue of how to prepare a proper one. That so call [sic] brief was affirmed on April 29, 1998. He admits to the courts he has handled many Direct Appeals, but never

10

On May 20, 1998, the CCA denied the Motion for

Reconsideration.[7]  Rhodes failed to file a request for federal

habeas representation within the CCA's statutorily required

fifteen days from the denial of relief, as required by Article

---

> has handled a State Habeas Corpus Writ of a death penalty
> case.
>
> Sir, I need help with this situation and My State Habeas
> Corpus proceedings, Nathaniel G. Rhodes did nothing for me
> while he has been on my case.  I have tried many times to
> contact him with no responds [sic].  The only time he
> contacted me was when he told me he was appointed to my
> case.  He wouldn't except [sic] my phone calls or answer my
> letters.
>
> I'm asking to have my State Habeas Corpus proceeding
> reconsidered.  I need to refile it because my lawyer was
> incompetent to do so.  I'm asking to have a competent lawyer
> appointed to me to refile a legitimate application for me
> and a few months to do it in.
>
> Attorney, Mr. Rhodes has committed a grave error by not
> presenting or preserving any issues I had asked him to in my
> State Habeas Corpus writ. . . .

To document his attempts at communication with Rhodes, Martinez
attached a letter written to Rhodes that provides suggestions on
how Rhodes could investigate extra-record leads for the state
habeas petition.  A series of letters from Martinez to Rhodes,
included in the record, encouraged the preservation of legal
issues necessary to collaterally attack his death sentence.

[7]    During the interim, on May 11, 1998, Martinez had
written Rhodes inquiring into the status of his already denied
habeas petition.  Martinez specifically requested Rhodes to
ensure that certain issues were presented so that he could
preserve those issues in his federal writ of habeas corpus.
Martinez stated, "Sir, in the motion you filed you said this was
your first time you ever filed a State Habeas Corpus Writ, so
understandably did not know exactly how to prepare the brief.
Sir there were many things not presented in the brief that I
really wanted to be raise [sic] so it could also be preserved for
my Federal Writ."

11

11.071, § 2(e).  See TEX. CODE CRIM. PROC. ANN. art 11.071, § 2(e).

Instead, Rhodes filed another motion to withdraw as counsel.  The

CCA rejected this motion and advised Rhodes to comply with the

requirements of Article 11.071, § 2(e).

## B. Federal Court Proceedings

In the United States District Court for the Southern

District of Texas, Rhodes filed a Motion to Withdraw as Attorney

of Record.  On July 2, 1998, the district court entered an Order

denying the Motion, observing that Rhodes's Motion had failed to

establish that there was a pending post-conviction proceeding on

Martinez's behalf.  The district court order stated:

> [T]he Court notes that Movant Rhodes would be well-advised
> to file an application for habeas corpus relief on behalf of
> Johnny Joe Martinez and to file contemporaneously with that
> application a motion to withdraw as attorney of record, a
> motion to appoint new counsel, and a motion for permission
> to supplement the application at a later date.

On July 23, 1998, Rhodes filed a federal Petition for Writ of

Habeas Corpus pursuant to 28 U.S.C. § 2254.  Rhodes submitted the

Petition on a preprinted form designed for pro se prisoners.  The

Petition was accompanied by a Motion to Withdraw as Attorney of

Record, in which Rhodes stated that another attorney should be

appointed whose "background, knowledge, or experience would

enable him or her to properly represent the Defendant."  The

district court initially denied the Motion to Withdraw, because

Rhodes paid the five-dollar filing fee accompanying the Petition.

This payment had the unintended effect of undermining Martinez's

12

ability to demonstrate his indigent status. On September 17, 1998, however, the district court granted Rhodes's Motion to Withdraw.

With new counsel, Martinez raised six issues in his federal habeas petition. Martinez claimed that (1) trial counsel rendered ineffective assistance of counsel at the punishment phase of trial in violation of the Sixth Amendment by failing to adequately investigate and present mitigating evidence; (2) trial counsel rendered ineffective assistance at the punishment phase of trial in violation of the Sixth Amendment by failing to present relevant psychiatric evidence concerning Martinez's future dangerousness and mitigating factors; (3) the CCA unreasonably applied clearly established federal law when it determined that the jury's finding of future dangerousness was supported by sufficient evidence; (4) the CCA denied Martinez his Eighth Amendment right to meaningful appellate review of his death sentence when it deviated from precedent and held the evidence sufficient to support the jury's positive answer to the future dangerousness special issue; (5) the CCA denied Martinez his state-created liberty interest in meaningful appellate review of the future dangerousness special issue when it deviated from analogous precedent and rejected his challenge to the sufficiency of the aggravating evidence; and (6) the trial court denied Martinez his Eighth and Fourteenth Amendment rights when it denied him the opportunity to inform the jury that a sentence of

13

life would render him ineligible for parole for thirty-five years.

On August 25, 1999, the district court denied all claims. The district court found that Martinez's two punishment phase ineffective assistance of counsel claims were procedurally defaulted and that the incompetence of state habeas counsel could not serve as "cause" to excuse the procedural defaults. The district court denied Martinez's claim that the evidence of his future dangerousness was insufficient, applying the test announced in Drinkard v. Johnson, 97 F.3d 751 (5th Cir. 1996), abrogation recognized by Beazley v. Johnson, 242 F.3d 248, 256 (5th Cir. 2001). The district court found that, as a matter of federal law, there was no reason why the events of the crime could not be sufficient to support a finding of future dangerousness. The district court also found that because there is no clearly established federal constitutional right requiring the CCA to follow its own case law consistently, Martinez's Fourteenth Amendment due process claim to meaningful appellate review must fail. Finally, the district court found that Martinez's request to inform the jury that he would not be eligible for parole for thirty-five years was foreclosed by precedent. The district court granted a certificate of appealability on all issues.

Martinez timely appealed, raising the three arguments now before this court: (1) that his claim of ineffective assistance

14

of trial counsel was not procedurally defaulted because Martinez could demonstrate "cause" for the procedural default, (2) that Martinez was arbitrarily sentenced to death in violation of the Eighth Amendment when the CCA "unreasonably" interpreted federal law concerning the sufficiency of the evidence required to support a finding of Martinez's future dangerousness, and (3) that Martinez's due process rights under the Fourteenth Amendment were violated by the failure of the CCA to fairly and consistently review the sufficiency of evidence of future dangerousness and to conduct that review in accordance with prescribed standards of state law.

## III.  STANDARD OF REVIEW

"In a habeas corpus appeal, we review the district court's findings of fact for clear error and review its conclusions of law de novo, applying the same standard of review to the state court's decision as the district court."  Thompson v. Cain, 161 F.3d 802, 805 (5th Cir. 1998).  Because the district court granted summary judgment to the State, this court must determine whether the record discloses any genuine issues of material fact, such that would preclude summary judgment in the State's favor. See Meanes v. Johnson, 138 F.3d 1007, 1010 (5th Cir. 1998). "Summary judgment is proper only 'if the pleadings, depositions, answers to interrogatories and admissions on file, together with

15

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Turner v. Houma Mun. Fire & Police Civil Serv. Bd., 229 F.3d 478, 482 (5th Cir. 2000) (quoting FED. R. CIV. P. 56(c)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). Further, because Martinez filed his federal habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (1996), the statute applies to his case. See Lindh v. Murphy, 521 U.S. 320, 326-27 (1997).

## IV.  PROCEDURAL DEFAULT

On appeal, Martinez argues first that he was denied effective assistance of counsel in violation of the Sixth Amendment during both the punishment phase of trial[8] and the

---

[8]  Martinez contends that his trial counsel failed to investigate the possibility of mitigating evidence, including "conduct[ing] a thorough investigation of the defendant's background," (Terry) Williams v. Taylor, 529 U.S. 362, 396 (2000), and thus failed to present available mitigating evidence in the punishment stage. Martinez argues that trial counsel met only once with his family and asked only superficial questions. Therefore, trial counsel did not even begin an investigation into whether there was a possibility of helpful mitigating evidence. Martinez argues that this failure to investigate cannot be a strategic choice. Federal habeas counsel has included numerous signed and notarized affidavits demonstrating the existence of substantial and easily accessible mitigating evidence relating to a history of sexual abuse, physical abuse, his mother's drug addiction to heroin, and other potentially mitigating circumstances.
Martinez argues that trial counsel did not introduce any pure mitigation evidence at the punishment stage of trial.

16

state habeas proceedings.[9]  The district court denied relief on

_____

Martinez states that the punishment phase witnesses only addressed Martinez's lack of past violent behavior and did not attempt to develop other mitigation evidence that would have provided a more complete picture of his difficult personal circumstances and childhood.  Martinez thus argues that this failure to make a reasonable investigation into the existence of possible mitigation evidence and the failure to present such evidence constituted deficient performance under Strickland v. Washington, 466 U.S. 668, 691-92 (1984), and prejudice under Strickland and (Terry) Williams, 529 U.S. at 396-97.  Further, Martinez argues that because the State presented no punishment phase evidence, coupled with the fact that Martinez's youth, intoxication, remorse, cooperation with the police, and history of non-violent behavior countenanced against the death penalty, this error affected the outcome of his sentence.  Therefore, the omission of mitigating evidence, which went directly to one of the two special issues, was especially prejudicial and negatively affected his ultimate sentence.

[9]  According to the affidavits filed in support of Martinez's federal habeas petition, during the entirety of the state habeas proceedings, Rhodes did not once meet with Martinez or contact him by telephone.  According to Martinez, over the one year of representation, Rhodes sent Martinez only two one-page letters, one on April 9, 1997, and one on June 9, 1997.  Martinez also asserts the following evidence of ineffectiveness: (1) Rhodes did not respond to any of Martinez's letters, nor did he accept or return any of Martinez's phone calls; (2) Rhodes did not hire an investigator or an expert to develop extra-record evidence; (3) Rhodes did not send Martinez any of the copies of documents he filed on his client's behalf; (4) Rhodes never provided Martinez a copy of the actual state writ of habeas corpus application; (5) Rhodes did not inform Martinez that his writ application had been denied and did not provide Martinez with a copy of Judge Baird's dissent inquiring about the competency of state habeas counsel; (6) Rhodes admitted to lacking the "background, knowledge, or experience" to properly represent Martinez; (7) Rhodes spent a total of 43.8 hours on the state habeas death penalty case, primarily reviewing the record; (8) the state habeas application prepared by Rhodes raised claims previously denied on direct appeal; (9) the actual petition is only five and one-half pages long; and (10) Rhodes did not incorporate any extra-record facts into the state habeas application, including the now-challenged claim of ineffective assistance of state trial counsel.

17

the trial-level ineffective assistance of counsel claim without reaching the merits. The district court held that this claim was procedurally barred because it had never been properly presented to the state courts. The district court did express concern regarding the "harsh" result of allowing the ineffective assistance of state habeas counsel to insulate the original ineffectiveness of state trial counsel; however, the district court considered itself bound by precedent.

The law is well established that a state prisoner seeking to raise claims in a federal petition for habeas corpus ordinarily must first present those claims to the state court and must exhaust state remedies. See 28 U.S.C. § 2254(b).[10] Martinez concedes that the ineffective assistance of counsel claim regarding his trial counsel's performance was not presented to the state courts on direct appeal or in his state habeas petition and, thus, is potentially procedurally barred for failure to exhaust. See Keeney v. Tamayo-Reyes, 504 U.S. 1, 9 (1992).[11] A petitioner may overcome such a procedural default, however, and obtain federal habeas corpus review of his barred claims on the

---

[10] Contrary to Martinez's assertion, under these facts, failure to provide "competent" counsel for a state habeas petition does not fall under the general catch-all exception provided in 28 U.S.C. § 2254(b)(1)(B)(ii).

[11] In addition, under Texas law, any attempt by Martinez to file a second state habeas corpus application would be dismissed as an abuse of the writ. See TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5(a) (2001).

18

merits, if he can demonstrate cause for the defaults and actual prejudice. See Jones v. Johnson, 171 F.3d 270, 277 (5th Cir. 1999).[12]

Martinez's argument is predicated on this "cause" exception to the state exhaustion requirement. Martinez argues that because of his state habeas counsel's damaging ineffectiveness, which precluded him from demonstrating his trial counsel's ineffectiveness at the punishment stage, he can demonstrate cause excusing the default and actual prejudice. See Murray v. Carrier, 477 U.S. 478, 485 (1986). Martinez relies on Coleman v. Thompson, 501 U.S. 722 (1991), to argue that the Supreme Court has not explicitly closed off an ineffective assistance of counsel claim concerning state habeas counsel when the state habeas forum is "the first forum in which a federal claim can be raised" in state court. See id. at 755.

In Coleman, the Supreme Court addressed a claim by a federal habeas petitioner who was seeking to demonstrate cause to excuse a procedural default that was the result of the ineffective assistance of his state post-conviction counsel. As an original matter, in the state habeas trial court, Coleman argued that his first state counsel was ineffective during trial, sentencing, and direct appeal. Under state law, the state habeas trial court was

---

[12] Martinez does not raise an argument based on the "fundamental miscarriage of justice" exception. See Coleman v. Thompson, 501 U.S. 722, 750 (1991).

19

the first forum in which Coleman could have raised this ineffective assistance claim.  See id. at 726-27.  The state habeas trial court held an evidentiary hearing and rejected the ineffectiveness claims.  Coleman's state post-conviction counsel then filed a notice of appeal from the judgment of the state habeas trial court three days after the deadline established by state law.  Due to this error, the state supreme court dismissed the appeal.  Coleman then petitioned the federal courts for relief based on his state post-conviction counsel's ineffective assistance in failing to timely appeal the state habeas trial court's judgment.  See id.

The Supreme Court first reviewed the general circumstances under which an attorney's error can constitute cause.  See id. at 752.  The court found that, "[t]here is no constitutional right to an attorney in state postconviction proceedings," id. (citing Pennsylvania v. Finley, 481 U.S. 551 (1987)), and "[c]onsequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings."  Id. Thus, Coleman must "bear the risk of attorney error that results in a procedural default."  Id. at 752-53.  Further, the Court defined "cause" as "something external to the petitioner, something that cannot fairly be attributed to him."  Id. at 753.[13]

_____

[13]    The Court further defined this external factor by quoting from Murray v. Carrier, 477 U.S. 478, 488 (1986):

The Court then considered Coleman's argument that there must be some exception for those cases involving constitutional claims that can only be raised for the first time in state post-conviction proceedings. See id. at 755 ("For Coleman to prevail, therefore, there must be an exception to the rule of [Pennsylvania v. ]Finley[, 481 U.S. 551 (1987),] and [Murray v. ]Giarratano[, 492 U.S. 1 (1989),] in those cases where state collateral review is the first place a prisoner can present a challenge to his conviction."). The Court declined to decide whether an exception exists because one state court — the state habeas trial court — had addressed Coleman's claim at the evidentiary hearing. Because the effectiveness of Coleman's counsel before the state habeas trial court was not at issue, the Court needed only "to decide whether Coleman had a constitutional right to counsel on appeal from the state habeas trial court judgment." Id. In deciding that Coleman had no such right, the Court explained that indigent defendants have a right to

_____

> [W]e think that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule. For example, a showing that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that some interference by officials . . . made compliance impracticable, would constitute cause under this standard.

Coleman, 501 U.S. at 753 (alterations in original) (internal citations and quotations omitted).

effective appointed counsel in "the one and only appeal an indigent has as of right," id. at 756,[14] and that because Coleman had been effectively represented in the state habeas evidentiary hearing on his trial ineffectiveness claim, he had received his "one and only appeal." Id.

In the instant case, Martinez presents the issue purportedly reserved in Coleman. Martinez argues that he possessed a constitutional right to effective assistance of counsel in his first state habeas corpus proceeding so that he could raise his claims of ineffective assistance of trial counsel. Martinez explains that because his trial counsel also represented him on direct appeal, the state habeas corpus proceeding was his first opportunity to present his ineffective assistance of counsel claims. Because Rhodes provided such deficient performance, defaulting Martinez's claims without ever communicating with his client, researching the law, investigating, or developing an extra-record argument, Martinez contends that he has established cause to excuse his procedural default under Coleman.

This court is foreclosed by precedent from considering whether an exception exists under the Coleman rule. See Beazley v. Johnson, 242 F.3d 248, 256 (5th Cir. 2001); Jones v. Johnson,

_____

[14] The Court relied on Douglas v. California, 372 U.S. 353, 358 (1963) (establishing that an indigent criminal defendant is entitled to appointed counsel in his first appeal as of right and that this entitlement encompasses a right to effective assistance of counsel).

22

171 F.3d 270, 277 (5th Cir. 1999) ("The law is well-established, however, that such error committed in a post-conviction application, where there is no constitutional right to counsel, cannot constitute cause."); Callins v. Johnson, 89 F.3d 210, 212 (5th Cir. 1996) ("Callins contends that his habeas attorney's alleged ineffectiveness constitutes cause. We have already rejected that argument. '[C]ounsel's ineffectiveness will constitute cause only if it is an independent constitutional violation.'" (quoting Coleman, 501 U.S. at 755)). These cases control our determination that ineffective assistance of habeas counsel cannot provide cause for a procedural default. We note that other circuits have come to the same conclusion. See, e.g., Mackall v. Angelone, 131 F.3d 442, 449 (4th Cir. 1997) (en banc); Hill v. Jones, 81 F.3d 1015, 1025 (11th Cir. 1996) ("Thus, the possible exception to Finley and Giarratano the Supreme Court noted in Coleman simply does not exist in this circuit: a petitioner may not rely on his collateral counsel's ineffectiveness to excuse the procedural default of a claim even when the state collateral proceeding was the petitioner's first opportunity to raise the claim."); Nevius v. Sumner, 105 F.3d 453, 460 (9th Cir. 1996); Nolan v. Armontrout, 973 F.2d 615, 617 (8th Cir. 1992).

Despite this contrary authority, Martinez asks this court to "reevaluate" its precedent in light of the changes engendered by AEDPA and state habeas reforms, which have enhanced the

23

importance of competent state habeas counsel.  This panel may not undertake such a reevaluation, as it is bound by controlling precedent.[15]  We hold, therefore, that Martinez's ineffective assistance of counsel claim is procedurally barred and deny his claim for relief.

## V. SUFFICIENCY OF EVIDENCE DEMONSTRATING

## FUTURE DANGEROUSNESS

Martinez's second argument is that his death sentence was arbitrarily imposed in violation of the Eighth Amendment. Martinez contends that because there was insufficient evidence presented at trial to support the jury's affirmative answer to the special issue on future dangerousness, the CCA's affirmance of his death sentence based on legally insufficient evidence was arbitrary and capricious and, thus, unconstitutional.  Martinez focuses his claim on the CCA's alleged failure to review adequately the legal sufficiency of evidence, arguing that the constitutionality of the Texas death penalty statute, see TEX. CODE CRIM. PROC. ANN. art. 37.071, is predicated on meaningful appellate review to promote a non-arbitrary application of the

---

[15]  While we need not decide the issue, we note that Martinez's Coleman exception claim may be barred by Teague v. Lane, 489 U.S. 288, 301 (1989).

24

death penalty.[16]  See Clemons v. Mississippi, 494 U.S. 738, 749

(1990); Jurek v. Texas, 428 U.S. 262, 276 (1976); see also Parker

v. Dugger, 498 U.S. 308, 321 (1991).[17]

---

[16]  As a general matter, Martinez is correct that the
Supreme Court has stressed that state courts must provide
meaningful appellate review of death sentences.  See Clemons v.
Mississippi, 494 U.S. 738, 749 (1990) ("[T]his Court has
repeatedly emphasized that meaningful appellate review of death
sentences promotes reliability and consistency.");  Flores v.
Johnson, 210 F.3d 456, 459 (5th Cir. 2000) (Emilio Garza, J.,
specially concurring) ("Sentencing procedures for capital crimes,
. . . must be created and enforced in a way that ensures 'that
the punishment will [not] be inflicted in an arbitrary and
capricious manner.'" (quoting Gregg v. Georgia, 428 U.S. 153, 189
(1976))).

[17]  The State argues that the Constitution does not require
appellate review of Martinez's death sentence, and thus, no
constitutional error can be alleged based on a failure to provide
meaningful appellate review.  The State relies on Tuilaepa v.
California for the proposition that "the sentencer may be given
unbridled discretion in determining whether the death penalty
should be imposed after it has found that the defendant is a
member of the class made eligible for that penalty."  512 U.S.
967, 979-80 (1994) (internal quotations and citations omitted).
The State's reliance on Tuilaepa is misplaced.  Tuilaepa involved
a vagueness challenge to the definitions of California's penalty-
phase aggravating factors and, therefore, did not address the
adequacy of appellate review of the sufficiency of evidence issue
Martinez now raises.  Further, the State's argument misconstrues
the nature of Martinez's claim, which is not directed at the
jury, but at the CCA's alleged failure adequately to review the
legal sufficiency of evidence required to demonstrate future
dangerousness "beyond a reasonable doubt."
        The district court concluded that the Eighth and Fourteenth
Amendments impose a constitutional floor on the sufficiency of
evidence required to sustain the jury's verdict on the special
issue of future dangerousness, see Jackson v. Virginia, 443 U.S.
307, 323 (1979), and that the CCA was required to review that
determination.  We agree.  The Supreme Court has established that
meaningful appellate review of death sentences is fundamental to
the constitutional application of death penalty statutes.  See
Parker v. Dugger, 498 U.S. 308, 321 (1991); Clemons, 494 U.S. at
749 ("We have emphasized repeatedly the crucial role of
meaningful appellate review in ensuring that the death penalty is

25

Martinez's argument that his death sentence is arbitrary because insufficient evidence exists to find future dangerousness was presented to the state court, and is, therefore, not procedurally barred.[18] In addressing this claim, we first set

_____

not imposed arbitrarily or irrationally."); Pulley v. Harris, 465 U.S. 37, 54 (Stevens, J., concurring); see also Flores v. Johnson, 210 F.3d 456, 459 (5th Cir. 2000) (Emilio Garza, J., specially concurring). Most notably in Jurek, the Supreme Court upheld the Texas death penalty statute in part because of the meaningful appellate review provided by the CCA. See Jurek, 428 U.S. at 276 ("By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law. Because this system serves to assure that sentences of death will not be 'wantonly' or 'freakishly' imposed, it does not violate the Constitution."). While the State is correct that Martinez is not entitled to a "proportionality review" of his death sentence, see Pulley, 465 U.S. at 53, the issue is whether the CCA reviewed the sufficiency of evidence to prove future dangerousness under the constitutional standard set out in Jackson, 443 U.S. at 323. As we discuss infra in the text, this court has applied the Jackson standard to sufficiency of evidence challenges in the context of Texas's special issues. See Hughes v. Johnson, 191 F.3d 607, 619 (5th Cir. 1999); Green v. Johnson, 160 F.3d 1029, 1047 (5th Cir. 1998); Callins v. Collins, 998 F.2d 269, 276 (5th Cir. 1993); Fierro v. Lynaugh, 879 F.2d 1276, 1280 (5th Cir. 1989).

[18] The district court found that Martinez's amended state habeas corpus application did reference that the CCA had reached different decisions in indistinguishable cases and that "[t]hese two cases when taken together render the Texas Capital Murder Statute subject to the same flaw as previous laws which were held unconstitutional. That is, they allow for arbitrary infliction of the death penalty without standards of review." The district court also found that because the application explicitly cited the Fourteenth Amendment (which incorporates the Eighth Amendment) and adopted by reference the dissenting opinions on direct review that discuss the federal constitutional requirements raised in the petition (including Jackson, 443 U.S. at 323), these issues were fairly presented to state courts. See Gartrell v. Lynaugh, 833 F.2d 527, 528-29 (5th Cir. 1987). We also proceed under this reasoning.

forth the framework of 28 U.S.C. § 2254(d), as recently explained in (Terry) Williams v. Taylor, 529 U.S. 362 (2000), and then apply this framework to Martinez's case.

Under 28 U.S.C. § 2254(d), federal courts shall not grant relief for

> any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court in (Terry) Williams provided further clarification of these requirements. First, regarding the "contrary to" language, the Court explained:

> A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases . . . [or] if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.

(Terry) Williams, 529 U.S. at 405-06.

Regarding the "unreasonable application" clause, the Court majority explained: "A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision involv[ing] an unreasonable application of . . . clearly established Federal law." Id. at 407-08 (alterations in original) (citations and internal quotations

27

omitted).  The Court further explained:  "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

The standard set out in (Terry) Williams is an objective standard of reasonableness.  See id. at 409 ("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.").  The Supreme Court's clarification is especially relevant in the instant case because this objective standard replaced the more subjective standard, which was utilized by the district court below.  See Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996) (proposing a subjective "debatable among reasonable jurists" standard), abrogation recognized by Beazley v. Johnson, 424 F.3d 248, 256 (5th Cir. 2001).  This court has recognized the Supreme Court's explicit criticism of the Drinkard standard and has followed the objective reasonableness standard as the controlling Supreme Court authority.  See Tucker v. Johnson, 242 F.3d 617, 620-21 (5th Cir. 2001); Moore v. Johnson, 225 F.3d 495, 501 n.1 (5th Cir. 2000).  Having set out the AEDPA framework, we must now apply it to Martinez's particular legal challenge.

28

Pre-AEDPA, a federal habeas court's review was limited to determining whether the CCA's determination that the evidence was sufficient to find that Martinez would be a future danger to society "was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation."  See Lewis v. Jeffers, 497 U.S. 764, 780 (1990).  In Jeffers, the Supreme Court held that a federal habeas court reviewing a state court's finding of an aggravating factor should apply the "rational factfinder" test established in Jackson v. Virginia, 443 U.S. 307, 323 (1979),[19] to determine both whether the sentence violates the Fourteenth Amendment's guarantee against arbitrary deprivations of liberty and the Eighth Amendment's prohibition against the arbitrary infliction of the death penalty.  See Jeffers, 497 U.S. at 782 ("[T]he standard of federal review for determining whether a state court has violated the Fourteenth Amendment's guarantee against wholly arbitrary deprivations of liberty is equally applicable in safeguarding the Eighth Amendment's bedrock guarantee against the arbitrary or capricious imposition of the death penalty.").  Therefore, because it was an appropriate standard for safeguarding the Eighth Amendment's guarantee against the arbitrary and capricious

---

[19]  Under Jackson, a conviction violates the United States Constitution if "upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  443 U.S. at 324.  As discussed in footnote 17 supra and in the text infra, this court has applied Jackson to sentencing factors that must be proved beyond a reasonable doubt.

29

application of the death penalty, the Jackson standard was adopted.[20] This court has employed the Jackson standard to assess the adequacy of the evidence for a capital sentence in Texas sentencing decisions in both pre-AEDPA and post-AEDPA cases. See Hughes v. Johnson, 191 F.3d 607, 619 (5th Cir. 1999) (assuming without deciding that the court should apply Jackson to address the merits of a challenge to the sufficiency of evidence supporting a jury's answers to special issues at the penalty phase of a death penalty trial); Green v. Johnson, 160 F.3d 1029, 1047 (5th Cir. 1998); Callins v. Collins, 998 F.2d 269, 276 (5th Cir. 1993); Fierro v. Lynaugh, 879 F.2d 1276, 1280 (5th Cir. 1989); see also Flores, 210 F.3d at 469 (Emilio Garza, J., specially concurring) (recognizing that "future dangerousness, like any other element of the crime, must be proven beyond a reasonable doubt").

Under § 2254(d), the limited question before this court is whether the CCA's decision to reject Martinez's sufficiency of the evidence claim in regard to future dangerousness was an objectively unreasonable application of the clearly established federal law set out in Jackson.[21] We find that the CCA was not

---

[20] The rationale for this rule is that a state court's finding of an aggravating circumstance in a particular case "is arbitrary and capricious if and only if no reasonable sentencer could have so concluded." Jeffers, 497 U.S. at 783.

[21] While the Jackson case is not directly cited in the CCA's majority opinion, courts have recognized that "state appellate courts must apply at least the same constitutional

30

objectively unreasonably in its application of the Jackson standard.  In upholding the sentence of death, the CCA majority recognized that "[t]he circumstances of the offense alone may be sufficient to sustain the jury's affirmative answer to the issue on future dangerousness."  Martinez, 924 S.W.2d at 696.  In finding these circumstances sufficient, the court relied on the fact that Martinez stabbed the victim with a knife.  The court distinguished murders with knives from those involving guns, by stating that "a knife — a weapon which, by virtue of its very nature, forces the user to be in such close proximity to his victim that he is often touching him or comes into contact with him on each blow."  Id.  In addition, the CCA found that Martinez's admission at trial that he and Wortmann discussed how

standard [as federal courts] when reviewing convictions for sufficiency of the evidence."  See Gomez v. Acevedo, 106 F.3d 192, 197 n.5 (7th Cir.) ("Although Jackson's specific holding is limited to federal habeas review, the Court's opinion indicates a similar duty for state appellate courts.  The Court stated generally, for example, that a conviction in state court 'cannot constitutionally stand' where no rational trier of fact could find guilt beyond a reasonable doubt.'" (citing Jackson, 443 U.S. at 317-18)), vacated on other grounds by 522 U.S. 801 (1997). Thus, state courts have either adopted the Jackson standard or interpreted their own sufficiency standards as consistent with Jackson.  The CCA has evaluated the sufficiency of evidence to find future dangerousness under a Jackson standard.  See, e.g., Wilson v. State, 7 S.W.3d 136, 142 (Tex. Crim. App. 1999) (evaluating future dangerousness based on the Jackson standard); Martinez, 924 S.W.2d at 700 (Baird, J., dissenting in part) ("When reviewing the sufficiency of the evidence to sustain the death penalty, we employ the standard announced in Jackson.").  Therefore, our review of the CCA's decision is properly framed as whether that decision constitutes an "unreasonable application" of Jackson.

31

easy it would be to rob the store manifested an intent to use a deadly weapon without regard to human life. Thus, the CCA reasoned a jury could infer that the robbery was planned, and coupled with the violent nature of the murder, this could provide the basis for a finding that Martinez would probably be a continuing threat to society.

Therefore, under our limited AEDPA review, we conclude that the CCA did not objectively unreasonably apply the Jackson standard in determining, after a review of the evidence in the light most favorable to the prosecution, that a rational trier of fact could find the essential elements of future dangerousness beyond a reasonable doubt. See (Terry) Williams, 529 U.S. at 410. Accordingly, we deny Martinez's Eighth Amendment claim.

## VI. FOURTEENTH AMENDMENT DUE PROCESS VIOLATIONS

Martinez also argues that the State of Texas violated the Fourteenth Amendment by arbitrarily depriving him of his statutorily-created liberty interest in a competent post-conviction counsel. This due process challenge is analytically distinct from the Sixth Amendment challenge. Martinez argues that Article 11.071, § 2(a) of the Texas Code of Criminal Procedure guarantees that "[a]n applicant shall be represented by competent counsel," TEX. CODE CRIM. PROC. ANN. art. 11.071, § 2(a), and because Martinez was an indigent death-row inmate, he had a

32

"substantial and legitimate expectation" in this requirement. See Hicks v. Oklahoma, 447 U.S. 343, 345 (1980). Martinez contends that because the State of Texas appointed Rhodes to be his state habeas counsel and because Rhodes was incompetent, this failure to provide competent counsel was a deprivation of federal due process. See Evitts v. Lucey, 469 U.S. 387, 396 (1985).

We are unpersuaded by this argument for the reason that 28 U.S.C. § 2254(i) bars a federal habeas claim solely grounded in "the ineffectiveness or incompetence of counsel during . . . State collateral post-conviction proceedings." 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."); see also Beazley v. Johnson, 242 F.3d 248, 271 (5th Cir. 2001). Martinez has not provided this court with any argument regarding why the due process argument rests on anything other than the incompetence of Rhodes during state post-conviction proceedings. Because there is no other constitutional violation to accompany this claim, it is foreclosed by § 2254(i).[22]

As a final matter, Martinez argues that he also has a Fourteenth Amendment liberty interest in being treated fairly and

_____

[22] In similar fashion, because we interpret Martinez's argument that he has been denied meaningful access to the courts under the First and Fourteenth Amendments as a claim grounded solely in his ineffective assistance of state habeas counsel, § 2254(i) bars relief.

33

in a manner consistent with, and prescribed by, Texas law. Martinez contends that because the CCA routinely sets aside death sentences in cases in which the evidence of future dangerousness is less aggravating than in his case, he had an expectation that he would be treated under the same standard. Martinez has failed, however, to provide us with legal authority demonstrating that such a federal right to state court consistency has been found cognizable in federal habeas under the Fourteenth Amendment.

Federal habeas relief is reserved for the vindication of federal constitutional rights. See Manning v. Blackburn, 786 F.2d 710, 711-12 (5th Cir. 1986). In the instant case, Martinez has failed to demonstrate a liberty interest in the consistent application of state criminal law enforceable through the Due Process Clause. As the Supreme Court recognized in Lewis v. Jeffers, a state court's alleged misapplication of its own sentencing factors cannot provide federal habeas relief:

> Because federal habeas corpus relief does not lie for errors of state law, . . . federal habeas review of a state court's application of a constitutionally narrowed aggravating circumstance is limited, at most, to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation.

497 U.S. 764, 780 (1990) (internal quotations and citations omitted). As discussed previously in Part V, the standard for determining an "arbitrary or capricious" action is the Jackson rational factfinder test. Accordingly, a Jackson analysis is the

34

most appropriate framework to analyze both Martinez's Fourteenth Amendment due process and his Eighth Amendment claims. For the same reasons as discussed in Part V <u>supra</u>, regarding Martinez's Eighth Amendment argument, we find Martinez's Fourteenth Amendment argument fails to provide him with relief.

## VII. CONCLUSION

For the foregoing reasons, we conclude Martinez is not entitled to habeas corpus relief. The claims that were not procedurally defaulted are without merit. Accordingly, we AFFIRM the judgment of the district court.