United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 24, 2004**

Charles R. Fulbruge III
Clerk

I n the

# United States Court of Appeals
## for the Fifth Circuit

m 03-51067

DAVID MARTINEZ,

Petitioner-Appellant,

VERSUS

DOUGLAS DRETKE,
DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

Respondent-Appellee.

Appeal from the United States District Court
for the Western District of Texas
m A-02-CA-759

Before SMITH, DEMOSS, and STEWART,
Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

David Martinez appeals the denial of his petition for writ of habeas corpus. Finding no error, we affirm.

## I.

In October 1998, a jury convicted Martinez of the capital murder of Kiersa Paul while attempting to commit or committing robbery or

aggravated sexual assault.[1]  During the punishment phase of the trial, the defense and prosecution presented witnesses regarding Martinez's character, past experiences, and future dangerousness.  The prosecution also offered the testimony of an expert, Dr. Ferrara, who used the Hare Psychopathy Checklist to argue that Martinez posed a future danger to society.

The jury expressly found (1) that a probability existed that Martinez would commit future criminal acts of violence and would represent a continuing threat to society; and (2) that no sufficient mitigating circumstances existed to justify a life sentence rather than the death penalty.  Consequently, the court sentenced Martinez to death.

Martinez unsuccessfully challenged his conviction and sentence through a direct appeal and through a state habeas petition.  He filed a federal habeas petition pursuant to 28 U.S.C. § 2254.  The district court denied relief on all seven issues Martinez raised but issued a Certificate of Appealability ("COA"), pursuant to 28 U.S.C. § 2253(c)(2),[2] on four issues:

> (1) whether the petitioner was denied the effective assistance of counsel when his trial counsel failed to prepare for and adequately argue the results of the Hare Psychopathy Tests should be excluded, or adequately impeach the State's expert on this issue; (2) whether the petitioner's due process rights were violated with the admission of the Hare Psychopathy Tests; (3) whether the petitioner was denied the effective assistance of counsel when his trial counsel failed to investigate and present evidence of the substantial abuse suffered by the petitioner at the hands of his mother, father, and his father's sado-masochistic homosexual lover; and (4) whether the petitioner was denied the effective assistance of counsel when his trial attorneys failed to adequately investigate and present mitigating evidence as well as employ and prepare defense experts and cross-examine the State's experts in such a manner as to provide the jury a true and correct picture of the petitioner's future dangerousness.

The four grounds do not concern the validity

---

[1] A jogger found Paul's body along a trail.  Paul told her sister the previous night that she intended to meet an individual named Wolf at that location.  Her body was covered only by a pair of unbuttoned boxer shorts, and her legs were spread open.  Further investigation revealed injuries consistent with strangulation, blunt force injury to the head and nose, gouge marks on the neck, bruising of both nipples, cuts on her neck, breast, and stomach, and forceful sexual intercourse.

Martinez, whose nickname was "Wolf," told friends that he intended to meet a girl that evening along the trail.  He returned to his friends' house with a bicycle he did not own.  After executing a search warrant, the police determined that Martinez possessed Paul's bicycle and bicycle bag.  They also seized a Swiss army pocketknife owned by Martinez.  Forensic tests determined that hairs found on Paul were consistent with Martinez's hair and that Martinez's pocketknife contained blood that matched Paul's DNA.  Semen collected from Paul's underwear matched Martinez's DNA.

[2] Section 2253(c)(1) states that a party may not appeal "the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court" unless a circuit justice or judge issues a COA.  Section 2253(c)(2) notes that a COA can issue "only if the applicant has made a substantial showing of the denial of a constitutional right."

of the verdict but only address questions surrounding the punishment phase of the trial.[3] The district court did not err in denying Martinez's habeas petition on these four matters.

## II.

"In a habeas corpus appeal, we review the district court's findings of fact for clear error and its conclusions of law *de novo*, applying the same standards to the state court's decision as did the district court." *Busby v. Dretke*, 359 F.3d 708, 713 (5th Cir. 2004) (citing *Martinez v. Johnson*, 255 F.3d 229, 237 (5th Cir. 2001)). "[W]e must defer to the state habeas court unless its decision 'was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States.' . . . ." *Haynes v. Cain*, 298 F.3d 375, 379 (5th Cir.) (en banc) (quoting 28 U.S.C. § 2254(d)(1)), *cert. denied*, 537 U.S. 1072 (2002). Additionally, "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) (citing 28 U.S.C. § 2254(e)(1)).

## III.

Three of the questions on which the district court granted a COA center on the effectiveness of Martinez's appointed trial counsel. More specifically, they question counsel's constitutional effectiveness in investigating three separate matters.

Under *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant "must show that his counsel's assistance was deficient and that the deficiency prejudiced him." *Hopkins v. Cockrell*, 325 F.3d 579, 586 (5th Cir.) (citing *Washington*, 466 U.S. at 687)), *cert. denied*, 124 S. Ct. 430 (2003). "To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins v. Smith*, 539 U.S. 510, ___, 123 S. Ct. 2527, 2535 (2003) (quoting *Washington*, 466 U.S. at 688). If counsel performed deficiently, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Haynes*, 298 F.3d at 380 (quoting *Washington*, 466 U.S. at 694). With respect to investigations, we do not focus on the purported matters the counsel should have found or on the final decision to pursue a particular course but rather "whether the investigation supporting [a particular] decision . . . *was itself reasonable*." *Wiggins*, 539 U.S. at ___, 123 S. Ct. at 2536 (emphasis in original).

Martinez's trial counsel[4] did not act in an objectively deficient manner or below an objective standard of reasonableness. Rather, counsel thoroughly investigated and interviewed a variety of witnesses as part of their effort to spare their client from the death penalty.

First, Martinez maintains that his counsel did not adequately prepare themselves and did not sufficiently argue to exclude the Hare Psychopathy Test, which measures behavior

---

[3] Martinez has not appealed the denial of any other grounds for a COA.

[4] Different appointed counsel represented Martinez in his trial and in his habeas proceedings.

based on twenty characteristics to determine whether the subject meets that test's definition of a psychopath. Upon learning that Ferrara intended to use the Hare Test in his testimony, defense counsel objected and obtained a delay in the punishment phase so as to investigate and challenge[5] the validity of the test.

During the three days in which the court stayed its proceedings, counsel contacted their experts and located ample reference materials with which to cross-examine Ferrara. The challenge to the test and the cross-examination of Ferrara lasted half a day. Although the challenge did not succeed, counsel prepared so well that the trial judge complimented them on their efforts.

The attorneys' efforts did not fall below any standard of reasonableness. Instead, when faced with an adverse clinical test, the attorneys responded as well as could any reasonably competent attorney.[6] Once the court allowed the jury to consider the Hare Test, the attorneys introduced evidence to argue that Martinez's propensity for violence would decrease over time and that a life sentence would ensure that he would no longer endanger society. Such an approach allowed Martinez to challenge the test, to respond to the graphic evidence, and to offer a plausible reason not to order the death penalty. Martinez's counsel did not act in an objectively unreasonable manner.

Secondly, Martinez challenges his attorneys' investigation and presentation of alleged abuse that occurred at the hands of Martinez's parents and his father's sado-masochistic lover. Martinez offers that a more thorough investigation would have uncovered witnesses who would have more affirmatively testified as to the abuse that Martinez suffered.[7]

As the district court discussed and as the state habeas court noted, defense trial counsel introduced evidence to indicate that Martinez suffered physical and emotional abuse at the

---

[5] The challenge followed the approach of *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993).

[6] Our review of the record causes us to agree with the assessment of the district court:

There is no evidence that Martinez's attorneys performed objectively unreasonably under the [*Washington*] standard. To the contrary, Martinez's counsel timely objected to Dr. Ferrara's testimony and articulated several reasons for their objections. Their repeated and fervent objections persuaded the trial judge to continue the trial from a Thursday to a Monday morning, even though the judge stated he wanted to move the trial along. During this continuance, the attorneys consulted with their experts and collected materials regarding the Hare test and prepared a respectable cross-examination of Dr.
(continued...)

[6](...continued)
Ferrara during the *Daubert* hearing and in the presence of the jury. They also submitted expert testimony that Martinez was not at risk for future dangerousness because his propensity for violence will decrease over time. Overall, Martinez's attorneys responded to the Hare testimony in a professional reasonable manner.

[7] Martinez proffers that Jessica Scott, a high school friend, would have testified that Martinez was being pushed to engage in sexual acts with his father and the sado-masochistic lover. Scott also would have testified, at the punishment phase, that she learned that Martinez's father sexually abused Martinez.

4

hands of his mother.[8] The counsel, for strategic reasons, chose not to attack the mother directly while on the stand.[9] In light of the fact that "[w]e will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices," Martinez's trial counsel did not perform below any objective standard of reasonableness. *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997).[10]

With respect to alleged abuse from the father and his sado-masochistic lover, various witnesses gave differing accounts of what took place in Martinez's home.[11] Defense witnesses suggested that something changed after Martinez's father became involved with a new partner who had an interest in sado-masochism. John Reynolds, Martinez's father's prior partner, indicated that Martinez and the father dressed and acted "weirder" after the change in partners. Petitioner asserts that Jessica Scott, Mary Ellen Felps, and William Zachary would have testified that Martinez suffered abuse at the hands of his father and his father's partner.

The evidence available for trial, however, did not establish exactly what took place in Martinez's father's home. Martinez's counsel could not reach Martinez's father and failed in serving an out-of-state subpoena on him. Additionally, Martinez gave contradictory statements to various people regarding possible abuse.[12] Because Martinez's trial counsel could not compel Martinez's father to testify, and because scant direct evidence existed to support the claim of sexual abuse, the attorneys had to make a decision.

Given the mixture of available evidence, Martinez's attorneys adopted an approach that emphasized the difficult circumstances that Martinez faced but did not highlight possible sexual abuse. Trial counsel described their strategy in an affidavit they provided to the state habeas court: "David Martinez had good relationships with his mother, his friends, his teachers[,] was mistreated by his mother, and . . . he had difficulty because his father was in an openly homosexual relationship and in the business of making homosexual sex toys."

---

[8] Mary Felps, a social worker who visited Martinez's childhood home, testified that the home smelled, was covered with bird feces, and was one of the worst homes she had seen. She indicated that she believed the mother abused and neglected Martinez. Laura Walker, Martinez's probation officer for an earlier offense, testified that Martinez moved into his father's home because his mother had physically and emotionally abused him.

[9] In quoting an affidavit from Martinez's trial counsel, the district court noted that "[w]hile the defense called Martinez's mother to the stand 'to give the jurors an idea of what kind of person she was,' 'for strategic reasons, [they] did not try to annihilate her.'"

[10] *See also Washington*, 466 U.S. at 701 ("Counsel's strategy choice was well within the range of professionally reasonable judgments, and the decision not to seek more character or psychological evidence than was already in hand was likewise reasonable.").

[11] During the time Martinez lived with his father, the father changed partners.

[12] Although Martinez told his probation officer that his mother had abused him, he denied any abuse at the hands of his father. When Martinez met with another psychiatrist while awaiting the capital trial, he denied that any abuse from either parent had occurred. Additionally, Martinez told Felps that he loved his father and that nothing was wrong.

The attorneys attempted to use Felps's testimony to suggest that the parents abused Martinez, but they could not "substantiate any sexual activity between David and David's father or David's father's lover, Evan." Again, an unsuccessful strategy does not necessarily indicate constitutionally deficient counsel.

Thirdly, Martinez asserts that his trial counsel failed to investigate and prepare witnesses to present sufficient mitigating evidence so as to give a more favorable image of Martinez's future dangerousness. Martinez offers a number of witnesses, including those listed previously, who allegedly would have offered more mitigating information. Felps indicates that greater preparation on the part of the defense attorneys would have enabled her to testify in a more composed manner and to connect with the jury. Felps also wishes that she could have testified more directly as to possible abuse from Martinez's father. William Zachary allegedly would have undermined some of the testimony of Sarah Yoder, a prosecution witness.[13]

Counsel's failure to offer these individuals' and any other parties' testimony did not render their performance deficient. Trial counsel presented numerous witnesses who testified to Martinez's positive character traits.[14] Although Felps wished that she could have given a more persuasive form of testimony, the

district court correctly noted that she had the opportunity to present the testimony that she now wishes she had given.[15] Though Zachary's testimony might have undermined Yoder's statements to some degree, it would not have contradicted the knife incident or any specific incident in which Martinez might have engaged in inappropriate sexual behavior.

Thus, Martinez's trial attorneys did not perform in a manner that fell below any objective standard of reasonableness. They conducted investigations and located numerous witnesses to help their client avoid the death penalty. In the course of the punishment phase, they had to make strategic decisions based on the available evidence and on the predicted effect a certain approach might have on the jury. Martinez has not satisfied the first prong of *Washington*. Thus, his claims with respect to the first, third, and fourth issues on which he requested a COA are denied.

IV.

Martinez asserts that the introduction of the Hare Psychopathy Test violated his due process rights. As we have indicated, the test considers twenty factors in determining whether a person meets the definition of a psychopath. Ferrara testified on behalf of the prosecution and concluded that Martinez was a psychopath. Although Martinez's counsel challenged the validity of the test in front of the jury, the court allowed the jury to consider

---

[13] Yoder testified that Martinez often forced her into uncomfortable and unwanted sexual situations and that Martinez once held a hunting knife to her throat. Zachary would have testified that Yoder consented to light bondage and enjoyed the practice.

[14] Such witnesses included Martinez's eighth-grade teacher, ninth-grade teachers, high-school counsel, and high-school theater director.

[15] As the district court stated, "Thus, while in the perfect trial, Felps might have been more prepared, she did have the opportunity at trial to give the testimony she now states she wishes she would have given, and in fact did give some of that testimony. Whether or not she had a connection with the jury is not Martinez's counsel's responsibility."

it in its punishment determination.

Martinez argues that the test has significant weaknesses and inadequacies and that Ferrara did not follow the test's actual procedures. We agree with the district court that the trial court's decision to admit the test did not violate "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The test itself does not involve any constitutionally suspect factors such as race or ethnicity.[16] The jury had the opportunity to listen to defense counsel's articulation of the test's weaknesses and to the cross-examination of Ferrara. Because the jury considered a number of pieces of evidence regarding Martinez's future dangerousness, and because Martinez's counsel challenged the merits of the Hare Test's procedures, the court did not violate Martinez's due process rights by allowing the test and Ferrara's testimony into evidence.

The judgment denying habeas relief is AFFIRMED.

---

[16] *See, e.g.*, *McCleskey v. Kemp*, 481 U.S. 279, 309 n.30 (1987) ("The Constitution prohibits racially biased prosecutorial arguments.").