# Revised, October 20, 2000

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

————————

m 99-50927

————————

MICHAEL PATRICK MOORE,

Petitioner-Appellant,

VERSUS

GARY L. JOHNSON,
DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,

Respondent-Appellee.

————————————

Appeal from the United States District Court
for the Western District of Texas

————————————

August 23, 2000

Before JOLLY, SMITH, and BARKSDALE,
    Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Michael Moore seeks a certificate of appealability ("COA") to allow him to present six claims to this court. Because Moore's claims lack merit under the requisite standard, we deny a COA.

## I.

Moore was convicted of capital murder and sentenced to death. He directly appealed his

conviction and sentence to the Texas Court of Criminal Appeals, then petitioned the United States Supreme Court for review, but was denied both times. Moore then filed an application for a writ of habeas corpus in the state courts and federal district court but was denied again at each stage. *See Moore v. State*, 935 S.W.2d 124, 126-27 (Tex. Crim. App. 1996), *cert. denied*, 520 U.S. 1219 (1997).

The Court of Criminal Appeals's opinion denying Moore's direct appeal set out the following facts underlying his conviction and sentencing:

> Armed with a gun and a knife, appellant entered the victim's home at about 2:20 am and headed toward the bedrooms. At the time he entered the home, appellant knew it was occupied. He was dressed in black so that he would not be seen in the dark. Appellant encountered the victim and a struggle ensued between them. The victim was stabbed several times by appellant who then dropped his knife. The victim was screaming so appellant drew his revolver and shot her. Because of the number and depth of the wounds the victim received, the medical examiner characterized the murder as "overkill" and "particularly brutal." The victim's fourteen year old son discovered her body. Appellant then fled the scene of the crime. Shortly thereafter, a police officer spotted appellant driving without his headlights. The officer attempted to get appellant to pull over, but appellant led the police on a high-speed car chase followed by a pursuit on foot. After appellant was apprehended, the police found a .22 caliber pistol and 50 rounds of ammunition in appellant's car. While the facts of the crime itself are perhaps not alone sufficient to support an affirmative finding to the future dangerousness special issue, additional evidence introduced at trial does support such a finding.

> At the punishment phase the State introduced records from the Conners Children's Home, where appellant resided during part of his childhood, containing information about appellant when he was a child. The records indicate appellant twice set fire to his house and once to the Children's Home, threatened to kill his parents and blame their deaths on his younger brother, and tried to stab his younger brother with a pair of scissors. As a child, appellant continuously exhibited violent and improper sexual behavior. While serving in the Navy, appellant was on unauthorized absence three times and was convicted of grand larceny. The State also introduced appellant's notebook entitled "The Girls of Copperas Cove" in which he listed the names and addresses of 300 teenaged girls of Copperas Cove. Many of these girls including T.R., the victim's daughter, testified that appellant stalked, harassed, and threatened them. The State introduced evidence of various extraneous offenses, including several burglaries which often took place while the victims were home, perpetrated against the girls listed in the notebook. Letters that appellant wrote to several of the girls in which he threatened to rape them were introduced into evidence, including one letter written to a junior high student threatening to rape her and her best friend. Appellant's notebook

also contained the license plate numbers of a Coryell County Justice of the Peace and a Copperas Cove police sergeant. Appellant testified that the notebook was not in its "final form." On direct examination, appellant admitted to being involved in a physical altercation while in jail.

The State also called Dr. Coons, a psychiatrist, to testify to appellant's future danger to society. He noted appellant's childhood displays of anger and violence and his lawless behavior. Dr. Coons reviewed the State's files and records of appellant, as well as appellant's psychological and psychiatric records, and was presented a hypothetical question embodying the significant facts of the case. Based on this information, Dr. Coons stated that appellant lacks a conscience, is a continuing threat to society, and would continue to commit criminal acts of violence. He stated violence and anger were well integrated into appellant's personality and that appellant's behavior would carry over into prison society. Dr. Coons testified that appellant would be manipulative, vindictive, and a threat to smaller prisoners.

*Moore*, 935 S.W.2d at 126-27.

In response to this testimony, Moore presented evidence that he had been beaten and neglected by his mother in his infancy, cared for by his maternal grandmother for a period, placed in foster care, and eventually returned to his family, where abuse began anew. He dropped out of school, attempted suicide, and joined the Navy. After honorable discharge, he moved in again with his mother and her new husband and found employment and a fi-

ancee. Two weeks before he was to be married, however, he found that his fiancee was seeing another man. Moore presented witnesses who testified that he was not violent or aggressive, including Dr. Windel Dickerson, a licensed psychologist, and a social worker from Moore's foster home, who testified that Moore would not be a continuing threat in a prison setting.

Following denial of the habeas petition, the district court denied Moore a COA. He now seeks one from this court.

## II.

Under 28 U.S.C. § 2253(c)(1)(A), Moore must first obtain a COA before he may receive full appellate review of the denial of habeas relief. A COA can issue only if Moore makes "a substantial showing of the denial of a constitutional right, a demonstration that . . . includes showing that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 120 S. Ct. 1595, 1603-04 (2000) (internal quotation marks and citation omitted).[1] Uncertainly about the propriety of

---

[1] *Hill v. Johnson*, 210 F.3d 481, 484 (5th Cir. 2000), explains that earning a COA "requires the applicant to demonstrate *that the issues are debatable among jurists of reason*; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further" (citing *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir.1996)) (internal quotation marks omitted; emphasis added). *Hill* was decided only a few days before *Slack* and only two days after *Williams v. Taylor*, 120 S. Ct. 1495, 1521 (2000), in which the Court explained, however, that the Fourth Circuit had erred in hold-
(continued...)

granting a COA is resolved in Moore's favor,

and the severity of his prescribed penalty colors our consideration of whether he has met his "substantial showing" burden. *Hill*, 210 F.3d at 484.

In assessing whether [a petitioner] is entitled to a COA, we must keep in mind the deference scheme laid out in 28 U.S.C. § 2254(d). *See Trevino v. Johnson*, 168 F.3d 173, 181 (5th Cir.), *cert. denied*, . . .120 S.Ct. 22 . . .(1999). Under that scheme, we review pure questions of law and mixed questions of law and fact under § 2254(d)(1), and review questions of fact under § 2254-(d)(2), provided that the state court adjudicated the claim on the merits. *See* 28 U.S.C. § 2254(d). . . .[2]

As a result, we must defer to the state court unless its decision "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254-(d)(1). A decision is contrary to clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, . . . 120 S. Ct. 1495, 1523 . . .(2000). Under § 2254(d)(1)'s "unreasonable application" language, a writ may issue "if the state court identifies the correct gov-

---

[1](...continued) ing that "a state-court decision involves an 'unreasonable application of . . . clearly established Federal law' only if the state court has applied federal law 'in a manner that reasonable jurists would all agree is unreasonable.'"

The Court thought the explication of "unreasonable application" potentially misleading because it threatened to "transform the inquiry into a subjective one by resting [the court's] determination . . . on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case." *Id.* at 1521-22. The Court then specified that in *Drinkard* this circuit had erroneously made such a subjectively based determination. *Id.* at 1522. The *Williams* court considered the impropriety of the "reasonable jurist" language with reference specifically to a denial of habeas relief rather than to the denial of a COA, but we nonetheless confidently follow the Court by removing this putatively subjective consideration from our analysis in this instance.

Moore argues that a COA should be granted because the district court, in denying him habeas relief, mentioned that "[a] determination is 'unreasonable' 'only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was incorrect.'" The district court did not, however, indicate that it was employing a subjective, rather than an objective, test of "reasonability" and did not rely on the subjective impressions of any jurists in coming to its conclusion that habeas relief was unwarranted. The district court's stray reference to the "reasonable jurist" standard, never mentioned again or made part of the court's analysis, though error, is harmless error and not a sufficient basis upon which to grant a COA. *Cf. Orellana v. Kyle,* 65 F.3d 29, 33 (5th Cir. 1995) (application of incorrect legal standard harmless if conclusion unchanged).

---

[2] The opinion of the Court of Criminal Appeals affirming Moore's conviction and sentence of death reveals that the conviction followed adjudication on the merits, *Moore*, 935 S.W.2d at 126, and Moore does not challenge this revelation.

4

erning legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 120 S. Ct. at 1523. Factual findings are presumed to be correct, *see* 28 U.S.C. § 2254(e)(1), and we will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(2).

*Id.* at 484-85.

### III.

Moore seeks a COA with regard to four related claims, which at their root argue that he should have been afforded, by the state, expert assistance in jury selection and development of mitigation evidence. Because this is a question of law, the district court could have issued a writ of habeas corpus only if Texas's review procedures are "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). We can grant a COA only if courts could objectively disagree with regard to whether Texas has so erred, or if our jurisprudence would be ennobled by further consideration of the question.

With regard to the mitigation expert, it appears that the trial court provided Moore the opportunity to present additional information to demonstrate that the expert "would be significantly more effective in marshaling the evidence in [Moore]'s behalf than his own counsel," but that "no further request or showing of necessity for a mitigation expert was made." Moore, as a result, did not enjoy the benefits of a mitigation expert. Later, before the Court

of Criminal Appeals, Moore again failed to argue that he should have been provided a mitigation expert. That court held that "since appellant does not make any arguments regarding expert assistance on this issue, we will only address expert assistance on the jury selection issue." *Moore,* 935 S.W.2d at 130 n.2. If a petitioner "offer[s] little more than undeveloped assertions that the requested assistance would be beneficial, we find no deprivation of due process in the trial judge's decision" not to provide that assistance. *Caldwell v. Mississippi,* 472 U.S. 320, 323 n.1 (1985). Moreover, claims that are barred as a consequence of a failure to comply with state procedural rules do not merit habeas relief[3] and therefore cannot warrant issuance of a COA.

Moore's claims that he was constitutionally entitled to either of these experts fail on their merits as well. He bases his argument on the pronouncement in *Ake v. Oklahoma*, 470 U.S. 68 (1985), that states must provide indigent defendants "access to a competent psychiatrist" in cases in which "a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial." *Id.* at 83. Moore argues that the *Ake* holding compels a finding in his favor.

In coming to its conclusion, the Court in *Ake* held that

[t]his Court has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense. . . . [A] criminal trial is fundamentally unfair if

---

[3] *Coleman v. Thompson*, 501 U.S. 722, 754 (1991).

5

the State proceeds against an indigent defendant without making certain *that he has access to the raw materials integral to the building of an effective defense*. Thus, while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, it has often reaffirmed that fundamental fairness entitles indigent defendants to *an adequate opportunity to present their claims fairly* within the adversary system.

*Id.* at 76-77 (internal citations and quotation marks omitted; emphases added). This circuit has, in light of *Ake*, held that "non-psychiatric experts . . . should be provided only if the evidence is both critical to the conviction and subject to varying expert opinion." *Yohey v. Collins*, 985 F.2d 222, 227 (5th Cir. 1993) (citations and internal quotation marks omitted).

Neither of Moore's claims of right to expert assistance can survive under these standards. His purported right to a jury-selection expert withers before the language of *Ake*. As the Court explained, a defendant cannot expect the state to provide him a most-sophisticated defense; rather, he is entitled to "access to the raw materials integral to the building of an effective defense." *Ake*, 470 U.S. at 77. Most of those raw materials come to the defendant in the form of his court-appointed lawyerSSin his expert knowledge about how to negotiate the rules of court, how to mount an effective defense, and so forth. Other materials come from lay witnesses, such as evidence necessary to the defendant to establish his defense. Defendants enjoy access to court-appointed psychiatric professionals because the Court expects those professionals to

gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury; [] analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior; and [] offer opinions about how the defendant's mental condition might have affected his behavior at the time in question. They know the probative questions to ask of the opposing party's psychiatrists and how to interpret their answers. Unlike lay witnesses, who can merely describe symptoms they believe might be relevant to the defendant's mental state, psychiatrists can identify the "elusive and often deceptive" symptoms of insanity, *Solesbee v. Balkcom*, 339 U.S. 9, 12 . . . (1950), and tell the jury why their observations are relevant. Further, where permitted by evidentiary rules, psychiatrists can translate a medical diagnosis into language that will assist the trier of fact, and therefore offer evidence in a form that has meaning for the task at hand. Through this process of investigation, interpretation, and testimony, psychiatrists ideally assist lay jurors, who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense.

*Id.* at 80.

Despite Moore's claims to the contrary, jury selection is not a mysterious process to be undertaken by those learned in the law only with the assistance of outside professionals. All competent lawyers are endowed with the "raw materials" required to pick a jury fairly

6

disposed toward doing substantive justice. While the wealthiest of defendants might elect to spend their defense funds on jury consultants, indigent defendants are not privileged to force the state to expend its funds on this exercise in bolstering an attorney's fundamental skills. Meanwhile, of course, a defendant does not lack "an adequate opportunity to present [his] claims fairly" because he has been denied a jury consultant. Communicating with the jury is a quintessential responsibility of counsel.

Moore's claim of entitlement to a mitigation expert fails under the *Yohey* explication of a defendant's right to non-psychiatric experts. As the *Yohey* court explained, "[a]n indigent defendant requesting non-psychiatric experts must demonstrate something more than a mere possibility of assistance from a requested expert." *Yohey*, 985 F.2d at 227. Moore does not make such a showing.

As the recital of facts indicates, Moore's defense included testimony from lay and psychiatric witnesses favorable to him suggesting that his childhood had been scarring and that he did not present a threat to his fellow prisoners. He provides no explanation of how a mitigation expert might have provided "critical" assistance to a defense team already including a lawyer and psychiatrist, both cognizant of the role of mitigating evidence in staving off the death penalty.

The precedent of the Supreme Court and this circuit, then, forecloses entirely Moore's arguments, denying him the chance to demonstrate that our court could resolve the issues in his favor or that the questions are adequate to deserve encouragement to proceed further. He therefore has not made a substantial showing of the denial of a constitutional right and

cannot receive a COA on these grounds.[4]

## IV.

Moore argues that we should issue a COA on the question whether his constitutional rights were violated by the failure to change venue from the county in which the murder occurred, because of the pretrial publicity surrounding the murder and his alleged involvement in it. Jury impartiality is a question of fact. *See King v. Lynaugh*, 850 F.2d 1055, 1058 (5th Cir. 1988).

The trial court found, and the Court of Criminal Appeals agreed, that "the record does not support appellant's claims" of jury partiality. *Moore*, 935 S.W.2d at 129. In determining whether to grant habeas relief, a federal court must presume the correctness of this finding and "will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hill*, 210 F.3d at 485 (citing 28 U.S.C. § 2254(d)(2), (e)(1)). Unless we decide that a court could find that the Texas courts had made an unreasonable determination or that the issue merits further consideration, we cannot issue a COA with regard to this question.

We do not so decide. Moore presented no

---

[4] Moore also asked for a COA so that this circuit could consider the issue of whether the district court erred by declaring that "an indigent defendant could *never* be entitled to" a jury-selection or mitigation expert. It strains the language of the district court's opinion to argue that the court so declared at all, especially with reference to the mitigation expert (the appointment of whom was denied, in part, because expert psychological testimony had been allowed in this instance).

evidence that individual jurors were prejudiced. As we have explained, "[a]s a general rule, a state defendant who seeks habeas relief as a result of pretrial publicity must demonstrate an actual, identifiable prejudice on the part of members of the jury that is attributable to that publicity." *Willie v. Maggio*, 737 F.2d 1372, 1386 (5th Cir. 1984). Moore did submit some evidence indicating that the press had covered not only the murder but also his alleged involvement in it and the fact that Moore had maintained a list of local high school girls. The evidence suggested that the community was scared and repulsed by this information. This evidence raises the possibility that Moore might have demonstrated, under the rule created by *Rideau v. Louisiana*, 373 U.S. 723 (1963), that because

> a petitioner [has adduced] evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community, "(jury) prejudice is presumed and there is no further duty to establish bias."

*Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir. 1980) (explaining *Rideau*). The Court of Criminal Appeals, however, noted that other evidence had been adduced as well. Moore, it explained,

> called various representatives from the local media to testify at the venue hearing. These witnesses testified that the pre-trial publicity had not been inflammatory or even excessive. Appellant presented no evidence at all that "most persons" in Copperas Cove were "terrified" of him and worried that he would be released from custody; to the con-

trary, the Sheriff of Coryell County testified that there had been no untoward concern in Copperas Cove about appellant. Appellant also produced no evidence that the jurors "knew the victims or their families, and would sympathize with them."

*Moore*, 935 S.W.2d at 129. On the basis of this evidence, the trial court agreed with the state that Moore had not demonstrated such prejudice that the community had become *per se* incapable of yielding an unbiased jury, and the Court of Criminal Appeals agreed. On collateral review, the district court determined that this did not represent an "unreasonable" determination of the facts, and denied habeas relief. Because we do not think that any court could come to a different conclusion, or that justice would be served by considering this issue further, we deny COA on this issue.[5]

---

[5] Moore claims that in considering the question of venue change on direct appeal, the Court of Criminal Appeals employed a standard that is contrary to clearly established federal law. The standard explicated by the court was that

> the reviewing court determines whether there existed such a prejudice in the community that it is doubtful that the defendant received a fair trial by an impartial jury. Extensive knowledge in the community of either the crime or the defendant, without more, is insufficient to render a trial unconstitutional. Publicity about the case must be pervasive, prejudicial and inflammatory. Appellant must demonstrate an "actual, identifiable prejudice attributable to that publicity on the part of members of his jury" and that the prejudicial effect has so permeated the community that the prospective jurors' prejudicial opinions cannot be set aside.

(continued...)

8

## V.

Moore contends we should grant a COA on the question whether Texas violates the Constitution by refusing to allow its appellate courts to review the jury's determination of whether special mitigating factors exist to sentence a criminal otherwise fully qualified for death instead to life in prison. This, like the issues of expert-provision, is a question of law.

The Court of Criminal Appeals explained that

> [i]n Texas, mitigating evidence is admissible at the punishment phase of a capital murder trial. Once admitted, the jury may then give it weight, if in their individual minds it is appropriate, when answering the questions which determine sentence. However, "[t]he amount of weight that the factfinder might give any particular piece of mitigating evidence is left to 'the range of judgment

and discretion' exercised by each juror."

*Colella* [*v. State*], 915 S.W.2d [834,] 844 [(Tex. Crim. App. 1995)] (*citing Banda v. State*, 890 S.W.2d 42, 54 (Tex. Crim. App.1994), cert. denied, 515 U.S. 1105 . . . (1995)). "Mitigating evidence" is defined as "evidence that a juror might regard as reducing the defendant's moral blameworthiness." TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(f)(4) (emphasis added). Each juror individually determines what evidence, if any, mitigates against the just imposition of the death sentence. *Banda*, 890 S.W.2d at 54. "Because the weighing of 'mitigating evidence' is a subjective determination undertaken by each individual juror, we decline to review the evidence for sufficiency." *Colella*, 915 S.W.2d at 845. Whether to give particular evidence a mitigating effect is within the prerogative of individual jurors; thus, such a determination is unreviewable.

*Moore,* 935 S.W.2d at 128.

The Supreme Court requires that a jury's determination that a death sentence should issue must be guided by standards and reviewed by appellate courts to determine its propriety and non-arbitrariness.[6] Moore does not deny

---

[5](...continued)
*Moore,* 935 S.W.2d at 129 (citations omitted). Moore argues that this standard does not sufficiently account for the exception to the rule that actual prejudice on the part of jury members must be shown.

We agree that the Court of Criminal Appeals might have explained the standard of review more plainly. We note, however, that the court explicitly found that Moore's "suggestion that the trial court *was prejudiced by community outrage* is unsupported" because, largely, of evidence "that the pretrial publicity had not been inflammatory or even excessive." *Id.* (emphasis added). Publicity that is neither inflammatory nor excessive cannot fit within the rule of *Rideau* as understood in this circuit.

---

[6] *See, e.g., Clemons v. Mississippi,* 494 U.S. 738, 749 (1990) (stating that "this Court has repeatedly emphasized that meaningful appellate review of death sentences promotes reliability and consistency"); *Woodson v. North Carolina*, 428 U.S. 280, 302 (1976) (explaining that the Court had rejected "unbridled jury discretion in the im-
(continued...)

9

that Texas provides for appellate review of the jury's determination that first-degree murder has occurred and that a special aggravating factor exists, and of whether the proper procedures were followed in presenting to the jury all relevantly offered mitigation evidence in a separate punishment-phase hearing.

Neither can it be denied that the Court has approved of state-court appellate review structures that analyze not only the jury's guilt and special-factor determinations, but its weighing of the mitigation evidence as well. *See, e.g., Pulley v. Harris*, 465 U.S. 37, 51-53 (1984). In fact, the Court has occasionally used language implying that states *must* review the jury's consideration of demonstrated mitigating factors.

> It cannot be gainsaid that meaningful appellate review requires that the appellate court consider the defendant's actual record. "What is important . . . is an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 879 . . . (1983).

*Parker v. Dugger*, 498 U.S. 308, 321 (1991).

This passing phrase, however, lacks the force to withstand the much more explicit directives in *Tuilaepa v. California*, 512 U.S. 967 (1994), in which the Court distinguished between a jury's "eligibility decision," in which

"the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent)," *id.* at 971-72, and its "selection decision," in which "the sentencer determines whether a defendant eligible for the death penalty should in fact receive it." *Id.* The Court recognized that "separate requirements" applied to each decision. *Id.* It explained that the selection decision has properly been made "when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime." *Id.*

It is the eligibility decision that, according to the Court, must be made with maximum transparency to "make rationally reviewable the process for imposing a sentence of death." *Id.* at 973. "The selection decision, on the other hand, requires individualized sentencing and must be expansive enough to accommodate relevant mitigating evidence so as to assure an assessment of the defendant's culpability." *Id.*

Because of this concern for expansiveness in the selection decision, the Court held that

> [o]nce the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment. Indeed, the sentencer may be given unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty.

*Id.* at 979-80 (quotation marks, ellipses, and internal citation information omitted). It is just

---

[6](...continued) position of capital sentences" and requiring that juries be provided standards to guide them in their "inevitable exercise of the power to determine which first-degree murderers shall live and which shall die").

this narrowly cabined but unbridled discretion to consider any mitigating factors submitted by the defendants and weighed as the jury sees fit that Texas has bestowed upon the jury. In so doing, Texas followed Supreme Court instructions to the letter. No court could find that Texas had acted contrary to federal law as explained by the Supreme Court, and no benefit will arise from further consideration of the obvious.

The application for a COA is DENIED.