IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-50371
_____


DANIEL EARL RENEAU

                                    Petitioner - Appellant

        v.


JANIE COCKRELL, DIRECTOR, TEXAS
DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION


                                    Respondent - Appellee

_____

Appeal from the United States District Court
for the Western District of Texas
No. 99-CV-615
_____
December 5, 2001
Before KING, Chief Judge, and WIENER and DENNIS, Circuit Judges.

KING, Chief Judge:[*]

        Petitioner-Appellant Daniel Earl Reneau, a Texas death-row

inmate, appeals the district court's denial of his petition for a

writ of habeas corpus brought under 28 U.S.C. § 2254 (1994 &

_____

        [*]  Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

Supp. 2001). Our review is limited to the two issues on which the district court granted Reneau's request for a certificate of appealability: (1) whether Reneau's constitutional challenges to the Texas habeas corpus procedure are cognizable on federal habeas review, and (2) whether the Texas Court of Criminal Appeals properly determined that its review of the sufficiency of the evidence for Reneau's death sentence satisfied the requirement under the Eighth and Fourteenth Amendments that states provide meaningful review of death sentences. For the following reasons, we AFFIRM the district court's denial of habeas relief.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On January 22, 1996, a grand jury indicted Petitioner-Appellant Daniel Earl Reneau for intentionally causing the death of Kris Keeran in the course of committing and attempting to commit robbery. Felony-murder is a capital offense in Texas. See TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon 1994).[1] Reneau pleaded not guilty to the charge, and a jury convicted him and sentenced him to death.

---

[1] Section 19.03(a)(2) provides: "A person commits [capital murder] if he commits murder as defined under Section 19.02(b)(1) [i.e., "intentionally or knowingly causes the death of an individual"] and . . . intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, or obstruction or retaliation." TEX. PENAL CODE ANN. §§ 19.02(b)(1), 19.03(a)(2) (Vernon 1994).

During the guilt-innocence phase of Reneau's trial, the state spent one day presenting evidence of the following events. Over the course of approximately two weeks in December 1995, Reneau and Jeffrey Wood, who resided together with their girlfriends, made plans to rob a gas station located near their home. Initially, Wood and Reneau believed that they had convinced Kris Keeran and William Bunker, who worked as cashiers at the gas station, to participate in the robbery. Keeran and Bunker soon made clear, however, that they would not provide any assistance. Nevertheless, Wood and Reneau decided to carry out the robbery on their own.

Early in the morning of January 2, 1996, Reneau entered the gas station with a gun in his hand while Wood waited outside. Reneau pointed the gun at Keeran, who was standing behind the counter, and told Keeran to go into a back office. Keeran did not move, and Reneau shot him in the head. Proceeding with the robbery, Reneau went into the back office and took a safe. Wood, who had entered the gas station after Reneau fired the gun, removed a box of cash and a videocassette recorder containing a surveillance tape. They loaded the three items onto the truck that they had driven to the gas station and left. Keeran died almost instantaneously.

The jury convicted Reneau of capital murder. At the punishment phase of Reneau's trial, the state sought the death penalty. The state urged the jury that "there is a probability

3

that [Reneau] would commit criminal acts of violence that would constitute a continuing threat to society," one of the two findings that Texas law requires a jury to determine beyond a reasonable doubt before the state may impose the death penalty on a defendant convicted of capital murder. TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(b)(1) (Vernon Supp. 2001).[2] In support of that claim, the state relied on the evidence presented at the guilt-innocence phase of the trial and introduced further evidence of events occurring before the January 2, 1996 robbery and evidence of events occurring thereafter. Because Reneau's second issue relates to the sufficiency of the evidence for his death sentence, we set forth that evidence in some detail.

Nadia Mireles, Wood's girlfriend at the time of the robbery, testified that she lived with Wood, Reneau, and her sister (Reneau's girlfriend) from November 1995 until the January 2, 1996 robbery. She stated that during this time Wood and Reneau kept several firearms in the house and that Reneau had informed her that he had stolen two of them, one from a children's home and another from a gun store. The state also presented the testimony of Bennie Skinner and Aaron Toledo, who claimed that

---

[2] If the jury makes this "continuing threat" finding, the jury must then determine "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(e)(1).

4

they had participated in a total of three burglaries with Reneau and Wood.[3]  Both Toledo and Skinner testified that the group stole firearms during the burglaries.  They further stated that Reneau was armed during the burglaries and that he had conveyed to them that he was prepared to shoot someone if necessary.  The state also presented evidence connecting Reneau to a robbery of a convenience store that had taken place approximately one month before the January 2, 1996 robbery.  The investigating officer read to the jury Reneau's written confession stating that he and Wood had perpetrated the convenience store robbery and that Reneau had been the one who threatened the cashier with a gun.[4]

The state also presented the testimony of individuals who had encountered Reneau during his incarceration in county jail after the January 2, 1996 robbery.  Justin Lemond, who was Reneau's cellmate for a brief time, testified that Reneau had conveyed his desire to escape from the jail and had stated that "he wasn't afraid to take out a jailer, to take out a law enforcement official, but he was going to get out, one way or another."  Lemond further testified that in recounting the events

---

[3]  Both Skinner and Toledo testified that they had been involved in the burglary of the children's home.  Skinner also stated that he participated in the burglary of a residence with Reneau and Wood, and Toledo stated that he participated in the robbery of a gun store with Reneau and Wood.

[4]  The officer took Reneau's confession while he was incarcerated after being charged and arrested for the January 2, 1996 robbery.

5

of January 2, 1996, Reneau had not expressed any remorse about Keeran's death. Two prison officials testified that they overheard Reneau and Wood talking through the pipe duct that ran between their adjacent cells about what the officials concluded were escape plans.

In addition to cross-examining the state's witnesses, Reneau sought to show that he was not a continuing threat to society and to present mitigating evidence by introducing the testimony of several witnesses. Dr. Michael Arambula, a forensic psychiatrist who had examined Reneau and reviewed his personal and mental history, described Reneau's childhood as "very abusive." He testified that when Reneau was six to eight years old, the state had removed him from his home because he was subjected to severe physical abuse. Arambula stated that after Reneau was removed from his home, he "pretty much jumped around from one mental hospital to another mental hospital" until he was eighteen or nineteen years of age. Arambula told the jury that he had diagnosed Reneau with "severe personality disorder," a treatable condition. Further, Arambula testified: (1) that he was aware that Reneau would not be eligible for parole for 40 years if sentenced to life imprisonment for capital murder, (2) that individuals afflicted with personality disorders "generally get better" as they get older, and (3) that in a structured environment like a prison, individuals with severe personality disorders present a decreased risk of danger. On cross-

6

examination, Arambula stated that in making his prognosis on Reneau's potential for dangerousness, Arambula did not recall having been aware that Reneau had threatened people with firearms[5] or that Reneau had indicated his willingness to kill someone in order to escape from jail.

Other witnesses who testified for Reneau gave various positive accounts of his character. David Warner, who met Reneau in August 1995, testified that Reneau stayed with Warner and his four-year-old daughter for approximately six weeks. Warner testified that his daughter liked Reneau and that Warner had trusted Reneau enough to let him babysit. Warner further stated that he had never seen Reneau display violent behavior and that he was surprised when he learned that Reneau was a suspect in the January 2, 1996 robbery.

Two women who had met Reneau through Warner testified that they had never seen Reneau act angrily and that they felt comfortable when he was around their children. Zabra Pieper, who had briefly lived in the same apartment complex as Reneau, also testified that her three-year-old daughter liked Reneau and that he was "really good with [her]." One of the officers who accompanied Reneau back and forth between the jail and the courthouse during the trial testified that the officers had not

---

[5] Skinner and Toledo, who testified about their participation in burglaries with Reneau and Wood, both testified that Reneau had pointed a gun at them while warning them not to tell anyone about the burglaries.

had any problems with Reneau.  Robert Baudat, who had hired Reneau to help build log cabins, testified that Reneau was a satisfactory worker.

The jury answered "yes" to the first special issue —— whether Reneau would present a continuing threat to society —— and "no" to the second special issue —— whether there was any mitigating circumstance warranting a sentence of life imprisonment rather than a sentence of death.[6]  On March 20, 1997, the state trial court sentenced Reneau to death.

Reneau's trial counsel withdrew from representation and new counsel was appointed to represent him on direct appeal to the Texas Court of Criminal Appeals ("TCCA").[7]  The TCCA affirmed his conviction and sentence on January 27, 1999.  Reneau then filed a petition for certiorari with the U.S. Supreme Court, which was denied on November 8, 1999.

While his case was pending on direct appeal to the TCCA, Reneau petitioned for state habeas corpus relief.  Another attorney (i.e., not the attorney representing Reneau in his direct appeal) was appointed to represent him in his state habeas proceedings.  On April 22, 1999, the state trial court recommended that Reneau's habeas petition be denied on all

---

[6]  See supra note 2 and accompanying text.

[7]  Texas law provides that "[t]he judgment of conviction and sentence of death shall be subject to automatic review by the Court of Criminal Appeals."  TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(h) (Vernon Supp. 2001).

grounds. Determining that the record supported the trial court's recommendation, the TCCA entered an order denying Reneau's state habeas petition on September 15, 1999.

On March 8, 2000, Reneau filed a petition for a writ of federal habeas corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his death sentence on several grounds. The district court assigned Reneau's petition to a magistrate judge, who issued a report recommending that the district court dismiss the petition and grant the state's motion for summary judgment. On April 2, 2001, the district court denied all of Reneau's objections to the magistrate judge's report and entered an order adopting the magistrate judge's recommendation.

Reneau sought certificates of appealability ("COA") for two of the district court's holdings: (1) that his challenges to the Texas habeas corpus procedure for capital cases are not cognizable on federal habeas review, and (2) that the TCCA properly held that it afforded Reneau meaningful review of his death sentence as required by the Eighth and Fourteenth Amendments. The district court granted Reneau a COA on each holding.

## II. FEDERAL HABEAS STANDARD OF REVIEW

In a federal habeas appeal, we review a district court's grant of summary judgment de novo, "applying the same standard of review to the state court's decision as the district court"

9

applied. Beazley v. Johnson, 242 F.3d 248, 255 (5th Cir. 2001) (quoting Thompson v. Cain, 161 F.3d 802, 805 (5th Cir. 1998)). We consider all of the facts in the summary judgment record in the light most favorable to Reneau, the nonmoving party. See Williams v. Scott, 35 F.3d 159, 161 (5th Cir. 1994).

Because Reneau filed his petition for federal habeas corpus after the date of the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 100 Stat. 1214 (codified as amended at 28 U.S.C. § 2254 (1994 & Supp. 2001)) ("AEDPA"), the district court's federal habeas review was governed by AEDPA. See Penry v. Johnson, 121 S. Ct. 1910, 1918 (2001).

Under § 2254(d) of AEDPA, habeas relief is not available to a state prisoner

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (Supp. 2001).

In this case, state court factual determinations are not at issue, and thus subsection (1) of § 2254(d) provides the framework for our inquiry. The Supreme Court recently elaborated

10

on the § 2254(d)(1) standards.  See <u>Williams v. Taylor</u>, 529 U.S.
362 (2000).  Applying statutory construction principles, the
Court determined that the phrases "contrary to" and "unreasonable
application" establish "two categories of cases in which a state
prisoner may obtain federal habeas relief with respect to a claim
adjudicated on the merits in state court."  <u>Id.</u> at 404.
According to the Court, a state court decision may be "contrary
to . . . clearly established Federal law, as determined by the
Supreme Court" if: (1) "the state court applies a rule that
contradicts the governing law set forth in [the Supreme Court's]
cases," or (2) "the state court confronts a set of facts that are
materially indistinguishable from a decision of [the Supreme]
Court and nevertheless arrives at a result different from
[Supreme Court] precedent."  <u>Id.</u> at 405-06.

As to the second category of cases warranting federal habeas
relief, the Court determined that a state court decision is "an
unreasonable application of clearly established" Supreme Court
precedent if the state court "correctly identifies the governing
legal rule but applies it unreasonably to the facts of a
particular prisoner's case."  <u>Id.</u> at 407-08.  The Court
established two guidelines for ascertaining when an application
of federal law is "unreasonable."  First, the inquiry into
unreasonableness is an <u>objective</u> one.  See <u>id.</u> at 409-10.
Second, the Court emphasized that "unreasonable" does not mean

11

merely "incorrect": an application of clearly established Supreme Court precedent must be incorrect and unreasonable to warrant federal habeas relief.  See id. at 410-12.

### III. COGNIZABILITY OF THE CONSTITUTIONAL CHALLENGES TO THE STATE'S HABEAS PROCEDURES

The district court granted Reneau a COA on its determination that his constitutional challenges to the Texas habeas corpus procedures are not cognizable on federal habeas review.  These challenges arise out of the Texas Legislature's significant revision of the state's habeas corpus statute in 1995.  Before this revision, all felony defendants had the right to petition for a writ of habeas corpus in Texas courts after their convictions and sentences became final, i.e., after the defendants had unsuccessfully appealed to the TCCA and petitioned the U.S. Supreme Court for certiorari.  See TEX. CODE CRIM. PROC. ANN. art. 11.07, § 2(a) (Vernon 1977).  Under the current habeas provisions, however, only petitioners "seek[ing] relief from a felony judgment imposing a penalty other than death" have the right to petition for state habeas relief after their convictions and sentences become final.  TEX. CODE CRIM. PROC. ANN. art. 11.07, §§ 1, 3(a) (Vernon Supp. 2001) (emphasis added).  In contrast, petitioners who have been sentenced to death must now pursue state habeas relief at the same time that they are pursuing direct appellate relief, i.e., before their convictions and

12

sentences become final.  See id. art. 11.071, §§ 1, 4(a)

("article 11.071").

Specifically, article 11.071 requires death-penalty

petitioners to file their state habeas petitions by "the 180th

day after the date the convicting court appoints counsel under

Section 2[8] or . . . the 45th day after the date the state's

original brief is filed on direct appeal with the [TCCA],

whichever date is later."  Id. art. 11.071, § 4(a).

Consequently, Reneau was required to file his state habeas

petition while his direct appeal was still pending in the TCCA.

The TCCA entered an order denying Reneau's state habeas petition

before the Supreme Court denied his petition for certiorari, and

thus before his conviction and sentence became final.

Reneau challenges article 11.071 on three constitutional

grounds.  First, Reneau argues that because the simultaneous

appeal/habeas procedure applies only to defendants who have been

sentenced to death, and all other felony defendants may wait

until their convictions and sentences have become final to seek

state habeas relief, article 11.071 deprived him of his

Fourteenth Amendment right to equal protection of the law.

Second, Reneau contends that article 11.071 deprived him of due

process by forcing him to petition for a writ of habeas corpus

---

[8]  Section 2 of article 11.071 gives death-penalty defendants a right to appointed counsel in habeas proceedings. See TEX. CODE CRIM. PROC. ANN. art. 11.071, § 2.

13

before he could have known the legal grounds on which the state court system based his final conviction and sentence.  Finally, Reneau argues that the filing requirements of article 11.071 deprived him of his right under the Sixth and Fourteenth Amendments to effective assistance of appellate counsel. According to Reneau, by including a claim of ineffective assistance of appellate counsel in his state habeas petition while he was still being represented by his appellate counsel, he risked losing the attorney-client privilege because there was a possibility that an adversarial relationship would develop between Reneau and his appellate counsel.[9]  Consequently, Reneau contends that the habeas "applicant is placed in the position of [choosing] between losing his attorney/client privilege with his appellate counsel on the one hand or defaulting his claim of ineffective assistance of appellate counsel on the other."

The district court held that it could not reach the merits of Reneau's challenges to article 11.071 because such challenges to state habeas procedures are not cognizable on federal habeas review.  The district court relied on a set of our cases holding that "infirmities in state habeas proceedings do not constitute grounds for federal habeas relief."  <u>Duff-Smith v. Collins</u>, 973

---

[9]  Reneau based this conclusion on Rule 503 of the Texas Rules of Evidence, which provides that the attorney-client privilege does not apply "[a]s to a communication relevant to an issue of breach of duty by a lawyer to the client or by a client to the lawyer." TEX. R. CRIM. EVID. 503(d)(3).

14

F.2d 1175, 1182 (5th Cir. 1992) (quoting <u>Vail v. Procunier</u>, 747 F.2d 277, 277 (5th Cir. 1984)); <u>see also</u> <u>Trevino v. Johnson</u>, 168 F.3d 173, 180 (5th Cir. 1999) (noting that "[o]ther circuits have similarly decided that habeas corpus relief is not available to correct alleged errors in state habeas proceedings); <u>Hallmark v. Johnson</u>, 118 F.3d 1073, 1080 (5th Cir. 1997) ("Insofar as [the petitioner] raises a due process challenge to the state habeas proceedings, his claim fails because infirmities in state habeas proceedings do not constitute grounds for relief in federal court.").

Acknowledging that his due process and Sixth Amendment challenges to the state's habeas procedure may be precluded by this circuit's precedent, Reneau argues that his equal protection challenge is distinguishable and should not be subject to the "no state habeas infirmities" rule. According to Reneau, in <u>Montgomery v. Meloy</u>, the Seventh Circuit recognized such a distinction in stating that "[u]nless state collateral review violates some independent constitutional right, such as the Equal Protection Clause, errors in state collateral review cannot form the basis for federal habeas corpus relief." 90 F.3d 1200, 1206 (7th Cir. 1996) (citations omitted). Reneau asserts that in making this distinction, the Seventh Circuit relied on <u>Lane v. Brown</u>, 372 U.S. 477 (1963), and <u>Smith v. Bennett</u>, 365 U.S. 708 (1961), in which the Supreme Court held that the state post-conviction proceedings at issue violated the Equal Protection

15

Clause. See Brown, 372 U.S. at 485; Smith, 365 U.S. at 713-14. Reneau also notes that the First Circuit has relied on Brown in holding that an equal protection challenge to state post-conviction proceedings is cognizable on federal habeas review. See Dickerson v. Walsh, 750 F.2d 150, 152, 154 (1st Cir. 1984) (stating that in Brown, "[t]he Supreme Court . . . specifically addressed state post-conviction procedure via habeas petitions"). Finally, Reneau points out that neither this court nor any of our sister circuits have applied the "no state habeas infirmities" rule to an equal protection claim.

Reneau correctly perceives that our cases preclude federal habeas review of his due process and Sixth Amendment challenges to the state's habeas procedure. Our "no state habeas infirmities" rule is based on one of the jurisdictional prerequisites of federal habeas review. The statute authorizing federal habeas review provides:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a) (1994) (emphasis added). We have explained that the "no state habeas infirmities" rule is necessary to give effect to this § 2254(a) jurisdictional prerequisite because a claim that a state's post-conviction procedures violate "the

16

Constitution or laws or treaties of the United States" is not a claim that the petitioner's <u>custody</u> violates "the Constitution or laws or treaties of the United States." <u>See, e.g.</u>, <u>Rudd v. Johnson</u>, 256 F.3d 317, 320 (5th Cir. 2001) (stating that claims based on "infirmities in state habeas proceedings" are not cognizable on federal habeas review "because an attack on the state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself"); <u>Trevino</u>, 168 F.3d at 180 (same). Accordingly, in federal habeas cases, "[w]e look only to the trial and direct appeal." <u>Duff-Smith</u>, 973 F.2d at 1182.

Reneau argues that despite this precedent, we should treat his equal protection claim differently from his Sixth Amendment and due process claims and deem his equal protection claim cognizable on federal habeas review. However, the Supreme Court authority that he cites does not support this position with the strength and clarity that would be necessary to justify a departure from our "no state habeas infirmities" rule. In <u>Smith</u>, the Supreme Court heard a challenge to state habeas proceedings on direct review of a state court decision — not on review of a district court's federal habeas decision. <u>See</u> 365 U.S. at 708-10. Our "no state habeas infirmities" rule is based on the assumption that federal courts do not have the authority <u>on federal habeas review</u> to hear challenges to state habeas procedures. The <u>Smith</u> Court did not exercise such authority.

17

Brown is more relevant to the cognizability issue because in that case the Court upheld a district court's grant of federal habeas relief on the ground that state habeas procedures violated the Equal Protection Clause. 372 U.S. at 478, 482-83. However, as the state correctly points out, the Brown Court did not explicitly address the issue of whether a challenge to state post-conviction proceedings is a claim that the petitioner's custody violates "the Constitution or laws or treaties of the United States," and thus is cognizable on federal habeas review. 28 U.S.C. § 2254(a) (full text supra). Reneau does not cite, and we have not found, a Supreme Court case explicitly addressing the cognizability issue presented in the instant case. In the absence of such authority, we cannot justify departing from our "no state habeas infirmities" cases to carve out an exception for an equal protection challenge to a state habeas procedure of the sort that Reneau advances here. Under our precedent, we must affirm the district court's dismissal of Reneau's equal protection challenge as well as his Sixth Amendment and due process challenges to the Texas habeas procedure; these claims are not cognizable on federal habeas review.

## IV. MEANINGFUL REVIEW OF THE DEATH SENTENCE

The other issue on which the district court granted a COA is whether the TCCA properly rejected Reneau's claim that the TCCA's review of his death sentence did not satisfy the requirement

18

under the Eighth and Fourteenth Amendments that states provide meaningful review of death sentences ("meaningful-review claim"). Reneau raised his meaningful-review claim on direct appeal to the TCCA and again in his habeas petition. However, the state habeas court did not address the claim, noting that Reneau's meaningful-review claim "ha[d] been previously reviewed and rejected by the [TCCA]."[10] Accordingly, the proper inquiry under AEDPA is whether the TCCA's decision on direct appeal denying Reneau's meaningful-review claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (full text supra, Part II).

Pursuant to the Texas death penalty statute, a jury must make two findings beyond a reasonable doubt before the state may impose the death penalty on a defendant: (1) that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society," TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(b)(1) (Vernon Supp. 2001) ("future danger finding"), and (2) "taking into consideration all of the evidence, including the circumstances of

---

[10] Texas law limits the remedy of habeas corpus to claims that were not raised on direct appeal. See Ex parte Ramos, 977 S.W.2d 616, 617 (Tex. Crim. App. 1998) (stating that because five of the habeas petitioner's claims "have already been raised and rejected on the direct appeal from this conviction[, t]hey will not be addressed on habeas corpus"); Ex parte Groves, 571 S.W.2d 888, 890 (Tex. Crim. App. 1978) ("[W]e have consistently held that habeas corpus will not lie as a substitute for an appeal.").

19

the offense, the defendant's character and background, and the personal moral culpability of the defendant, [that] there is [not] a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed," id. art. 37.071, § 2(e)(1) ("mitigation finding").[11]  Because the jury made these two necessary findings in Reneau's case, the trial court sentenced him to death.  See id. art. 37.071, § 2(g).[12]

Reneau contends that the TCCA denied him meaningful review by (1) refusing to conduct a factual sufficiency review of the jury's future danger finding, and (2) refusing to conduct any review of the jury's mitigation finding.  The TCCA held that its legal sufficiency review of the jury's future danger finding conducted pursuant to Jackson v. Virginia, 443 U.S. 307 (1979), provided Reneau with meaningful review of his death sentence.

---

[11]  "[I]n cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02 [of the Texas] Penal Code," the jury must also find that "the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken."  TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(b)(2) (Vernon Supp. 2001).

[12]  Section 2(g) of article 37.071 states that "[i]f the jury returns an affirmative finding on each issue submitted under Subsection (b) of this article and a negative finding on an issue submitted under Subsection (e) of this article, the court shall sentence the defendant to death."  TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(g).

20

The Supreme Court has clearly established "that meaningful appellate review of death sentences is fundamental to the constitutional application of death penalty statutes."  Martinez v. Johnson, 255 F.3d 229, 242 n.17 (5th Cir. 2001) (citing Parker v. Dugger, 498 U.S. 308, 321 (1991) and Clemons v. Mississippi, 494 U.S. 738, 749 (1990)); see also Moore v. Johnson, 225 F.3d 495, 505-06 (5th Cir. 2000) ("The Supreme Court requires that a jury's determination that a death sentence should issue must be guided by standards and reviewed by appellate courts to determine its propriety and non-arbitrariness.").  In Jackson, the Court held that in reviewing the sufficiency of the evidence for a state prisoner's conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  443 U.S. at 319.  We have held that appellate review of the sufficiency of the evidence for a death sentence is "meaningful" if conducted under the constitutional standard established by the Supreme Court in Jackson.  See Martinez, 255 F.3d at 242 n.17, 244.

Further, this court has determined that Supreme Court precedent requires a Jackson review of only the future danger finding, and not the mitigation finding.  In other habeas cases, we have rejected claims like Reneau's that challenge the Texas death penalty scheme on the ground that it prohibits appellate

21

review of the jury's mitigation finding.  For example, in <u>Hughes v. Johnson</u>, we held that "a state appellate court's limitation of its review in capital cases to the constitutional sufficiency of aggravating factors to support a death sentence, while totally ignoring compelling and uncontradicted mitigating evidence," is consistent with Supreme Court precedent and thus does not violate the constitutional right to meaningful appellate review of death sentences.  191 F.3d 607, 621 (5th Cir. 1999) (internal quotations omitted).  Similarly, in <u>Moore</u>, we stated that "[n]o court could find that" in making jury mitigation findings immune to appellate review, "Texas had acted contrary to federal law as explained by the Supreme Court."  225 F.3d at 507.  The TCCA's decision that a <u>Jackson</u> review of the jury's future danger finding satisfies the Eighth and Fourteenth Amendments' meaningful-review requirement is not "contrary to" clearly established Supreme Court precedent.

Accordingly, Reneau is entitled to federal habeas relief on his meaningful-review claim only if the TCCA's decision involved an objectively unreasonable application of controlling Supreme Court law.  <u>See</u> <u>Williams</u>, 529 U.S. at 409-10 (discussed <u>supra</u>, Part II).  Reneau argues that the TCCA's refusal to apply a factual sufficiency review of the evidence for the future danger finding was an unreasonable application because Texas law prevents the jury from considering certain facts that are constitutionally relevant to determining whether to impose a

22

death sentence. Reneau notes that although the TCCA has held that the term "society" means "prison society" as well as its ordinary meaning of "free society," the TCCA will not permit this broader definition to be included in the jury charge. Consequently, Reneau argues, "society" is unconstitutionally vague: without a definition making clear that "society" includes "prison society," the jury did not have the means to give effect to his evidence that he would not be a continuing threat to prison society. Reneau further contends that the deleterious effect of the state's refusal to define "society" for the jury was exacerbated by the requirement under Texas law that the jury charge include an instruction that the jury may not consider the period of statutory ineligibility for parole (which in Reneau's case is 40 years). According to Reneau, because the jury was not equipped to give effect to his constitutionally-relevant evidence that he would not present a continuing threat to prison society (because of the absence of a definition) and was effectively instructed to disregard such evidence (because of the prohibition against considering parole ineligibility), the jury did not determine whether the state had presented factually sufficient evidence to support a future danger finding. Thus, Reneau claims that the TCCA was obligated to provide him with a factual sufficiency review that takes into account his evidence that he would not represent a threat to prison society.

23

We are not altogether clear on why it is that Reneau considers a factual sufficiency review by the TCCA to be a proper substitute for a jury finding based on the charges that Reneau claims were constitutionally necessary. Indeed, Reneau argued that he was entitled to such jury findings in his claims challenging his death sentence on grounds of jury charge error, claims that he asserted in addition to his meaningful-review claim in the TCCA on direct review, in state habeas court, and in federal habeas court. There is no clearly established basis in Supreme Court precedent for the jury charge facet of Reneau's meaningful-review claim. Thus, the TCCA's decision does not involve an unreasonable application of clearly established Supreme Court precedent.

Because the TCCA's decision that it afforded Reneau meaningful review of his death sentence by conducting a Jackson review of the jury's future danger finding was neither "contrary to" nor "an unreasonable application of" clearly established Supreme Court precedent, we affirm the district court's denial of federal habeas relief on Reneau's meaningful-review claim.

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court denying Reneau's petition for a writ of habeas corpus.